REBECCA K.  SMITH
Public Interest Defense Center, P.C.
317 East Spruce Street
P.O. Box 7584
Missoula, MT 59807
Tel: (406) 531-8133
Fax: (406) 830-3085
publicdefense@gmail.com
Idaho State Bar #8346

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

## NORTHERN DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES<br><br>          Plaintiff,<br><br>vs.<br><br>KIMBERLY PIERSON, Idaho Panhandle National Forest Acting Forest Supervisor, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture.<br><br>          Defendants. | Case No:   2:21-cv-244<br><br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## I.  INTRODUCTION

1.    This is a civil action for judicial review under the Administrative Procedure Act and Endangered Species Act of the U.S. Forest Service's October 11, 2018 Decision Memo and May 28, 2021 Supplemental Decision Memo approving the Hanna Flats Project ("Project") on the Idaho Panhandle National Forest.

2.    Plaintiff Alliance for the Wild Rockies attests that the final decision approving the Project is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3.    Defendants' actions or omissions violate the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331 et seq., the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq.

4.    Plaintiff requests that the Court either vacate the Project decision pursuant to 5 U.S.C. § 706(2)(A) and/or enjoin implementation of the Project.

5.    Plaintiff seeks a declaratory judgment, injunctive relief, the award of costs and expenses of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II.  JURISDICTION

6.      This action arises under the laws of the United States and involves the United States as a Defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

7.      An actual controversy exists between Plaintiff and Defendants.  Plaintiff's members use and enjoy the Idaho Panhandle National Forest, including the Hanna Flats Project Area, for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities.  Plaintiff's members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8.      The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiff's members and staff have been and will be adversely affected and irreparably injured if Defendants implement the Project.  These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiff's requested relief under 28 U.S.C. §§ 2201 & 2202, 5 U.S.C. §§ 705 & 706.

9.      Plaintiff submitted scoping comments on the Project.  The Forest Service

categorically excluded this Project from NEPA analysis and stated that the

decision is not subject to an administrative review process.  Therefore,

Plaintiff exhausted administrative remedies.  Defendant's May 28, 2021

Decision Memo was the final administrative action of the U.S. Department

of Agriculture Forest Service.  Thus, the Court has jurisdiction to review

Plaintiff's APA claims.

### III.  VENUE

10.    Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Civil Rule

3.1. The Project is located in Bonner County, so venue is proper in the

Northern Division.  Additionally, Defendant Pierson signed the Decision

Memo approving the Project, and her office is located in Kootenai County,

also within the Northern Division of the United States District Court for the

District of Idaho.

### IV.  PARTIES

11.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-

profit public interest organization dedicated to the protection and

preservation of the native biodiversity of the Northern Rockies Bioregion,

its native plant, fish, and animal life, and its naturally functioning

ecosystems.  Its registered office is located in Missoula, Montana. The

Alliance has over 2,000 individual members.  Members of the Alliance

observe, enjoy, and appreciate the Northern Rockies' native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Idaho Panhandle National Forest. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

12.  Defendant KIMBERLY PIERSON is the Acting Forest Supervisor for the Idaho Panhandle National Forest. In that capacity, she is the official responsible for issuing the Decision Memo that authorized the Hanna Flats Project, and she is responsible for ensuring that the Project is in compliance with NEPA, NFMA, and APA.

13.  Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Idaho Panhandle National Forest.

## V.  FACTUAL ALLEGATIONS

PROJECT STATUS

14.  On October 11, 2018, former Forest Supervisor Higgins signed the initial

Decision Memo authorizing the Hanna Flats logging project on the Idaho

Panhandle National Forest.

15.    Plaintiff litigated the first Decision Memo (*Hanna Flats I*), which resulted

in a remand to the agency.

16.    On May 28, 2021, Defendants issued a Supplemental Decision Memo re-

approving the Project.

17.    On June 1, 2021, Defendants provided the Supplemental Decision Memo to

Plaintiff, and notified Plaintiff that Project activities could start as soon as

July 2, 2021.

18.    At the time of the filing of this Complaint, Project activities have not yet

started.

PROJECT AREA

19.    The Project area is located on the Priest Lake Ranger District of the Idaho

Panhandle National Forests and is approximately 25 miles north of the town

of Priest River, Idaho.

20.    The Project lies within the Priest Geographic Area.

21.    The Priest Geographic Area is located in Boundary and Bonner counties in

Idaho and Pend Oreille County in Washington.

22.    British Columbia borders the Priest Geographic Area on the north.

23.    Physically, the Priest Geographic Area forms a large bowl with the high

elevation Priest/Pend Oreille Divide on the west, and the high elevation Selkirk Mountains on the east with the two ranges joining near the Canadian border.

24. This bowl-shaped topography, with high ridges on three sides, captures cold air in the low elevations and traps cool moist air in the summer. As a result, the low elevation winter snow pack is deeper and more persistent than elsewhere in northern Idaho, and summertime conditions are relatively moist and cool compared to neighboring areas. A summer maritime storm track that dips down from Canada also contributes to favorable growing season moisture conditions.

25. This topography and moisture setting is likely part of the reason why upper Priest River contains the largest contiguous area of old growth cedar, hemlock, and grand fir in the interior western United States and the largest concentration of ancient cedar stands in northern Idaho.

26. There are approximately 71 miles of roads in the 10.6 square mile Hanna Flats Project area. This yields a road density of approximately 6.7 miles per square mile.

PROJECT DETAILS

27. The Project includes 1,843 acres of commercial logging, 360 acres of precommercial logging, and 149 acres of prescribed burning only.

28.   Approximately 1,109 acres of the commercial logging is "regeneration harvest," which means clear-cutting or modified clear-cutting.

29.   The Project also includes temporary road construction, excavated skid trail construction, and road maintenance.

GRIZZLY BEARS & ROADS

30.   The Selkirk grizzly bear is listed as a threatened species under the Endangered Species Act (ESA).

31.   The Selkirk grizzly population is very small.

32.   The most recent Selkirk grizzly monitoring report (published 2020) found a minimum population of 45 bears.

33.   The previous year's monitoring report (published 2019) found a minimum population of 61 bears.

34.   The monitoring report published in 2018 also found a minimum population of 61 bears.

35.   The most recent Selkirk grizzly monitoring report (published 2020) found that the population is failing three out of four criteria for recovery: females with cubs, mortality limit, and female mortality limit.

36.   The table below illustrates the failure of three out of four recovery criteria:

Table 3. Status of the Selkirk Mountains recovery zone during 2014–2019 in relation to the demographic recovery targets from the grizzly bear recovery plan (USFWS 1993).

| Recovery Criteria | Target | 2019 |
|---|---|---|
| Females w/cubs (6-yr avg) | 6 | 3.67 (22/6) |
| Human Caused Mortality limit [1] (4% of minimum population estimate) | 1.8 | 2.2 (6 yr avg) |
| Female Human Caused mortality limit [1] (30% of total mortality) | 0.5 | 1.0 (6 yr avg) |
| Distribution of females w/young in the most recent 6 years [2] | 7 of 10 BMUs | 8 of 10 BMUs |

[1] Includes both U.S. and B.C. mortalities.
[2] Includes only U.S. BMUs.

37.    The current mortality rate is 2.2 mortalities per year in general, and 1.0 female mortalities per year.

38.    The current mortality rates are the highest mortality rates since 2008.

39.    In the past 32 years of record keeping, only six years documented higher mortality rates.

40.    The most recent U.S. Fish & Wildlife Service species status assessment for grizzly bears (January 2021) finds that a decrease in conservation efforts for Selkirk grizzly bears will result in low resiliency, i.e. a decrease in species viability.

41.    The Hanna Flats Project is immediately adjacent to the Selkirk Grizzly Bear Recovery Zone and lies within the Priest "Bears Outside Recovery Zone" or "Priest BORZ" area in northern Idaho.

42.    The Forest Service states: "The action area for this project will be the Priest Bears Outside Recovery Zone (BORZ) area. This area was selected because

it will encompass all direct and indirect effects of the proposed project."

43.   The U.S. Fish & Wildlife Service (FWS) has long recognized that "[r]oads probably pose the most imminent threat to grizzly habitat today []."

44.   In general, FWS finds that "increased human access on open roads and continued human use of closed roads have overall detrimental effects on grizzly populations. Roads and road activity allow continued bear mortality risk, increase habituation of bears, and effectively decrease usable habitat."

45.   FWS also finds: "Negative association with roads can decrease habitat use. Negative association arises from bears' fear of vehicles, vehicle noise, other human-related noise around roads, human scent along roads, and hunting and shooting along or from roads. Bears that experience such negative effects learn to avoid the disturbance generated by roads. Such animals are unlikely to change this resultant avoidance behavior even after road closures and the lack of negative reenforcement. Even occasional human-related vehicle noise can result in continued road avoidance and habitat loss associated with such avoidance. In fact, unpredictable random road use, the kind of use that may occur with administrative use of closed roads, may be even more disturbing to bears that have a negative association with roads."

46.   FWS further finds: "Females who have learned to avoid roads may also teach their cubs to avoid roads. In this way, learned avoidance behavior can

persist for several generations of bears before they again utilize habitat

associated with closed roads. When roads are located in important habitats .

. . habitat loss through avoidance behavior can be significant due to the

denial of the resources in these areas to bears." AR:001304-1305.

47. Furthermore, FWS finds that "studies in northwestern Montana reinforce the

fact that the presence of even closed roads can affect grizzly populations. . .

. Avoidance behavior by bears of illegal vehicular traffic, foot traffic, and/or

authorized use behind road closures may account for the lack of use of areas

near roads by female grizzly bears in this area. . . . Since adult females are

the most important segment of the population, this lack of use of both

open-roaded and closed-roaded areas is significant to the population. . . . the

effects of road avoidance may result not only in higher mortality along

roads and in avoidance of and lack of use of the resources along roads, but

in the survival of young when their mothers are forced to live in less

favorable areas away from roads."

48. FWS further finds that "the effectiveness of road closures varies. Roads

closed to public use through the use of only signs or gates are often not

effective []. Funding and personnel necessary to maintain road closures and

enforce regulations are rarely adequate, resulting in limited closure

effectiveness. Roads closed with substantial physical barriers are more

effective in prohibiting vehicular traffic, but are still often accessible by

motorized all-terrain vehicles (ATVs), mountain bikes, and motorcycles. . . .

In summary, public disregard of road closures, as well as continual

administrative use, often reach such levels that the intent and objectives for

the closures are no longer being met. These roads still receive substantial

levels of human use and cannot legitimately be considered 'closed' for their

effects on bears when calculating the open road densities."

## ACCESS AMENDMENT & PRIEST BORZ ROADS

49.    In light of the scientific consensus regarding the harm posed to grizzlies by

both open and closed roads, and after prompting from several rounds of

litigation, in 2011, the Forest Service authorized the 2011 Forest Plan

Amendments for Motorized Access Management within the Selkirk and

Cabinet-Yaak Grizzly Bear Recovery Zones, which are commonly referred

to as the "Access Amendment."

50.    The Access Amendment is now part of the forest plans for the Idaho

Panhandle, Kootenai, and Lolo National Forests in Idaho and Montana.

51.    The 2015 Idaho Panhandle National Forest Plan includes the Access

Amendment as Standard FW-STD-WL-02.

52.    In part, the Access Amendment requires:

> II. The following access management applies to seven grizzly
> bear recurring use areas (i.e., BORZ areas) located outside of

11

the Cabinet-Yaak Grizzly Bear Recovery Zone (KNF and IPNFs) and Selkirk Grizzly Bear Recovery Zone (IPNFs):

A. The Forests shall ensure no increases in permanent linear miles of *open road* on National Forest System lands in any individual BORZ, *above the baseline conditions identified in table 26*, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares). Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ. *Temporary increases in linear miles of open roads are acceptable under the following conditions*:

1. Roads that are closed to public motorized use or roads created or reconstructed to facilitate land management activities that are otherwise closed to public use *may be "opened" to the public immediately following completion of all mechanized harvest* and post-harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e., June 16 - August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year.

B. The Forest shall ensure no net permanent increases in linear miles of *total roads* in any individual BORZ area *above the baseline conditions identified in table 26*, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares, etc.). Otherwise, potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or

prior to, new road construction or reconstruction of currently bermed or barriered roads. *Temporary increases (not off-set) in linear miles of total roads are acceptable under the following conditions*:

    1. Temporary increases in linear miles of total roads are acceptable under the following conditions:

        a. Newly constructed roads would be *effectively gated* and would be restricted with a CFR closure clarifying they are not open for public use.

        b. These roads shall be closed immediately upon completion of activities requiring use of the road, except as described in Part II., A.1., above. Roads must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

        c. Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels contained in table 26.

    C. Timber harvest activities that would occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities would be determined pursuant to project level consultation.

53.    Table 26 in the 2015 Idaho Panhandle National Forest Plan mirrors Table 16 of the Access Amendment Record of Decision.

54.    Table 26 in the 2015 Idaho Panhandle National Forest Plan states that the Access Amendment baseline for total roads in the Priest BORZ is <u>316.4 miles,</u> and the Access Amendment baseline for open roads in the Priest

BORZ is <u>314.4 miles</u>.

55. The Access Amendment Record of Decision defines the categories of roads.

56. The Access Amendment creates three categories of roads: open, gated, and barriered roads.

57. "[T]otal motorized routes" are "gated roads, open roads and open motorized trails."

58. The Access Amendment states that a gate is not a "barrier."

59. The Access Amendment defines a barriered road as a road that "must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years."

60. Accordingly, before any road may be subtracted from the total road calculation, it "must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years."

61. If a road is closed only with a gate, it still must be included in the total road calculation.

62. The Ninth Circuit has issued binding precedent regarding the Access Amendment: *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1036 (9th Cir. 2018) and *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1243

(9th Cir. 2017).

63.   First, in *Bradford*, the Ninth Circuit held that "any closure that fails to effectively prevent motorized access also fails to comply with Standard II(B) of the Access Amendments." 856 F.3d at 1243.

64.   Second, in *Savage*, the court held that if "undetermined," i.e. unauthorized, roads were "not included in the Access Amendments baseline calculation, [their] incorporation will result in a net increase of road mileage." 897 F.3d at 1036.

65.   Thus, binding Ninth Circuit authority finds that both illegal roads and roads with ineffective barriers must be counted in total road calculations, which then must be compared to the Access Amendment baseline.

66.   In October 2020, the U.S. Fish and Wildlife Service provided the following information regarding the calculation of authorized roads in the Priest BORZ:

| BORZ | Motorized Access Metric | Road Baseline (2011 ROD) | 2019 Motorized Roads | Motorized Trails (not counted in 2011) | Special Use Permit (not counted in 2011) | 2020 Motorized Routes (Pre-Project) | Post-Project Baseline |
|---|---|---|---|---|---|---|---|
| Priest | Open | 314.4 | 317.2 | 20.2 | 0 | 337.4 | 336.2 |
| | Total | 316.4 | 319.2 | 20.2 | 0.6 | 340.0 | 338.8 |

*Table 1. Motorized Route Mileage Baselines (adapted from Assessment, pp. 7-8, 18)*

67.   Thus, while the Access Amendment baseline for open roads is 314.4 miles,

the existing condition of authorized open roads in 2020 is 337.4 miles, and it will be 336.2 miles after Project implementation.

68.   Regarding total roads, the Access Amendment baseline for total roads is 316.4 miles, the existing condition of authorized total roads in 2020 is 337.4 miles, and it will be 336.2 miles after Project implementation.

69.   On April 9, 2021, the Forest Service created a note "To: Project Record," in which it attempts to change the Access Amendment baseline without a Forest Plan amendment.

70.   In its note "To: Project Record," the Forest Service attempts to change the Access Amendment baseline for the Priest BORZ to 340.0 miles for total roads and 337.4 miles for open roads.

71.   In its note "To: Project Record," the Forest Service represents that the attempt to change the Priest BORZ Access Amendment baseline is due to "pre-existing (i.e., in 2010) roads [that] were discovered since the plan was issued" and/or "miles of total and open roads where BORZ areas have expanded due to expansion of recurring grizzly bear use over the last ten years." No evidence is provided in support of either contention.

72.   The note "To: Project Record," and table of calculations above, address only authorized roads; they do not address unauthorized roads.

73.   The Forest Service concedes that there are at least 30.4 miles of unauthorized

roads in the Priest BORZ.

74.   The Fish and Wildlife Service believes that there are 33.8 miles of
unauthorized routes.

75.   The 2019 Forest Service annual monitoring report represents that – including
unauthorized roads – the existing condition was 373.3 miles of total roads
and 373.3 miles of open roads.

76.   The Forest Service represents that all 30.4 miles of unauthorized roads were
"closed" by the summer of 2020.

77.   The Fish and Wildlife Service similarly represents: "All 33.8 miles of
unauthorized routes . . . were addressed by the summer of 2020."

78.   To the contrary, the vast majority of unauthorized roads were not barricaded
in the manner required by the Access Amendment.  Instead, most
unauthorized routes simply have a tree laying in the front of the road, or a
gate that can be driven around.

79.   Additionally, approximately seven miles of cross-country ski trails that are
driveable roads have only a gate.  A gated road is not a barriered road, and
therefore it must be included in the calculation of total miles of roads.

80.   As an example, the Forest Service states that Road 318F has been closed. However, when Plaintiff's contractor visited the area in 2020, it became clear that the Forest Service simply cut down a tree and laid it across the road.  Subsequently, the fallen tree was easily removed by a motorized user with a chainsaw:



81.     Similarly, in 2020, Plaintiff's contractor also visited Road 313 DUC and

Road 313 DUB. Both of these roads are indicated as "closed" in the BorzAll

GIS layer.  However, in reality these roads are actively used as an open

motorized route between two open roads – Road 2519C, which connects to

main road 2519 (Raven Ranch Road), and Road 313 (Hanna Flats Road):



82.   Without photographic evidence of every purported closure, the Forest

Service's representation that it has eliminated motorized use on all 30 miles

of unauthorized roads, and 7 miles of ski trails, cannot be deemed credible.

SCOPING NOTICE

83.   The Scoping Notice for the Project was sent to the public in August 2017.

84.   The Forest Service allowed a 30-day public comment period in response to

the Scoping Notice.

85.   The Scoping Notice states that the Project would likely be exempt from

documentation in an Environmental Assessment or Environmental Impact

Statement, based upon the insect and disease infestation categorical

exclusion found in the HFRA at 16 U.S.C. §6591b.

86.   The Scoping Notice states:  "The insect and disease infestation category is

applicable for this project because . . . the entire project area is in the

wildland-urban interface . . . ."

87.   In the Scoping Notice, the Forest Service states that the Project "lies entirely

within the wildland-urban interface defined by Bonner County."

88.   The Scoping Notice does not provide the definition of wildland urban

interface.

89.   The Scoping Notice does not provide a map of wildland-urban interface.

90.   The Scoping Notice does not disclose the Access Amendment requirements.

91.  The Scoping Notice does not disclose the fact that the Project is in occupied grizzly bear habitat.

92.  The Scoping Notice does not disclose the amount of illegal motorized use occurring in the Project area.

93.  The Scoping Notice does not disclose the current miles of open or total motorized routes in the Priest BORZ.

BONNER COUNTY WILDLAND URBAN INTERFACE

94.  The most recent Bonner County Community Wildfire Protection Plan defines wildland urban interface as "an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence. Location: It is found in remote scattered development areas to highly developed urban areas and everywhere in between."

95.  Prior to the supplemental Decision Memo, the Bonner County wildland urban interface definition was not disclosed to the public in any of the Forest Service's analysis documents for the Project.

96.  The Bonner County Community Wildfire Protection Plan maps almost the entire county as wildland urban interface.

97.  Prior to the supplemental Decision Memo, the Bonner County wildland urban interface map was not disclosed to the public in any of the Forest

Service's analysis documents for the Project.

DECISION MEMO

98.    The initial Decision Memo for the Project was signed on October 11, 2018.

99.    The Decision Memo does not disclose the existing condition of roads open to

motorized use in the Priest BORZ.

100.    In Appendix C, Project Design Features, Wildlife, Paragraph 5, the Decision

Memo states:

> 5. Grizzly bear~ Temporary increases in linear miles associated
> with this project would be acceptable under the following
> conditions:
>
> a. All roads not designated as open on the motor vehicle use
> map would be effectively gated and would require a Code of
> Federal Regulation closure clarifying they are not open for
> public use.
>
> b. All roads not designated as open on the motor vehicle use
> map would be closed immediately upon completion of activities
> requiring use of the road. Roads must be closed with a berm,
> guardrail or other measure that effectively prevents motorized
> access (front end obliteration is the preferred method), and put
> in a condition such that a need for motorized access for
> maintenance is not anticipated for at least 10 years. Upon
> completion of the Hanna Flats Good Neighbor Authority
> Project, linear miles of total roads would be returned to or
> below the baseline levels.
>
> Estimated Effectiveness -High. These are standards from the
> motorized access amendment direction (USDA Forest Service
> 2011a). The standards were put in place to conserve grizzly bear
> habitat within the BORZ areas (USDI 201lb). This provision would
> be built into timber harvest contracts and implemented by the sale
> administrator.

101. Appendix C, Project Design Features, Wildlife, Paragraph 5 paraphrases Access Amendment section II (B)(1).

102. Appendix C, Project Design Features, Wildlife, Paragraph 5 omits part of the requirement of Access Amendment section II (B)(1)(c), which states in full: "Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels *contained in table 26*." (Emphasis added).

103. Appendix C, Project Design Features, Wildlife, Paragraph 5 does not disclose that the Forest Plan Table 26 states that the linear miles of total roads baseline level for the Priest BORZ is <u>316.4 miles</u>.

104. Appendix C, Project Design Features, Wildlife, Paragraph 5 does not acknowledge that at least 30 miles of roads not designated as open on the motor vehicle use map are *not effectively gated.*

105. Appendix C, Project Design Features, Wildlife does not disclose the requirements from Access Amendment section II(A)(1) for temporary increases in open roads.

106. The Decision Memo states: "The entire project is in the wildland-urban interface. See the 'Fire, Fuels, and Air Quality' resource report filed on the project webpage [web address omitted]."

107. The Decision Memo does not provide the definition of wildland urban

interface that the Forest Service used for the Project.

108. The Decision Memo does not provide the map of wildland-urban interface that the Forest Service used for the Project.

109. The "Fire, Fuels, and Air Quality Report" states: "This area is in wildland urban interface and areas of intermixed ownership, and thus is not high priority for the use of wildland fire."

110. The "Fire, Fuels, and Air Quality Report" does not provide a citation for the representation that the Project area "is in wildland urban interface. . . ."

111. The "Fire, Fuels, and Air Quality Report" does not provide the definition of wildland urban interface that the Forest Service used for the Project.

112. The "Fire, Fuels, and Air Quality Report" does not provide a map of wildland-urban interface that the Forest Service used for the Project.

REMAND ORDER IN *HANNA FLATS I*

113. In *Hanna Flats I*, this Court held: "[i]t is not enough to simply declare that the Project is within a wildland-urban interface, especially when the intended purpose of doing so – as in this case – is to avoid the requirement of preparing an EA (or EIS) as would otherwise be required under NEPA. There must be something else that connects the

dots and thereby would support Defendants' position that the categorical exclusion under HRFA applies to the Project. . . .In short, simply saying that the Project is within the wildland-urban interface, without more, does not make it so.

114.    In *Hanna Flats I*, this Court held: "Even if one could reverse-engineer from these materials the definition used by the USFS to conclude that the Project is within the wildland-urban interface, it would still fail HFRA's definition for the same. That is, whatever definition (uncertain or lacking entirely) of wildland urban interface the USFS applied to the Project, it did not clearly take into account at-risk communities as required by HFRA – uniquely defined therein as either (1) an interface community (with three or more structures per acre or a population density of 250 people per square mile), or (2) a group of homes/other structures with basic infrastructure and services within or adjacent to Federal land. See supra (citing 16 U.S.C. § 6511(1), (16)). To state – as Defendants do – that a community wildfire protection plan (like either Bonner County's 2012 or 2016 Wildfire Plans) by itself suffices to establish a wildland-urban interface for the purpose of invoking a categorical exclusion, ignores these realities."

115.    In *Hanna Flats I*, this Court held: "The Court must give meaning to all

the words used in defining wildland-urban interface and thus cannot

read out HFRA's explicit incorporation of at-risk communities in the

definition of wildland-urban interface, or ignore HFRA's simultaneous

definition of at-risk communities themselves."

116.   In *Hanna Flats I*, this Court held: "where [a community wildfire

protection plan] does not coincide with HFRA (e.g., when it defines

wildland-urban interface differently than HFRA does), it cannot then

operate as justification for a categorical exclusion under HFRA.

Otherwise, a local county could designate their entire county as

wildland-urban interface in a community wildfire protection plan, and

then use that designation as the basis to categorically exclude logging

projects throughout the county without the protections of NEPA.

Recognizing the importance of the public's participation in federal

actions that affect the environment, this is a problem."

117.   In *Hanna Flats I*, this Court held: "In sum, it is unclear how the

wildland-urban interface was defined here so that it could be

confirmed that the Project sits within such an area and therefore

qualifies for a categorical exclusion. . . . At the very least, the statutory

definition of wildland-urban interface was not used; as a result, the

USFS violated HFRA, rendering its use of the categorical exclusion

unlawful. Alliance's Motion for Summary Judgment (as to the Fourth

Claim for Relief) is granted in this respect."

118.  In *Hanna Flats I*, this Court held: "The action is remanded. The USFS

shall revisit its claim that the entire Project area is within the

wildland-urban interface. To this end, the USFS shall issue a

supplemental Decision Memo that clearly: (1) states how the

wildland-urban interface is defined; (2) applies the wildland-urban

interface (using the supplied definition) to a map that concurrently and

definitively depicts the Project area; and (3) explains how the Project

area falls within the wildland-urban interface under HFRA.  The point

of this exercise is to allow whatever conclusion is reached to be

replicated, tested, and confirmed.  The Project is suspended until such

review is complete and supplemental Decision Memo issued, with a

30-day Notice preceding any beginning or resumption of Project

related activities."

SUPPLEMENTAL DECISION MEMO

119.  The Forest Service signed a Supplemental Decision Memo on May 28,

2021.

120.  The Forest Service filed the Supplemental Decision Memo in *Hanna

Flats I* on June 1, 2021.

121.  On June 1, 2021, the Forest Service provided Plaintiff with notice that the Project activities may commence on July 2, 2021.

122.  The Supplemental Decision Memo cites the 2016 Bonner County wildland urban interface definition: "an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence. Location: It is found in remote scattered development areas to highly developed urban areas and everywhere in between."

123.  The Supplemental Decision Memo represents that the Forest Service used a 2015 map of wildland urban interface for the Project.

124.  The Supplemental Decision Memo does not explain how the Forest Service could have used a 2015 map if it used a 2016 definition.

125.  The Supplemental Decision Memo does not explain how the 2016 definition quoted above could be consistent with the plain language of the HFRA, as discussed at length in the *Hanna Flats I* summary judgment order, quoted above.

126.  The Supplemental Decision Memo does not provide evidence that the Project area is within or adjacent to "a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes)."

28

127. Instead, the Supplemental Decision Memo provides a conclusory
statement that the "Bonner County steering committee found that the
majority of communities in Bonner County are 'at risk" communities
under subsection ii of the HFRA definition because they consist of a
group homes and structures with basic infrastructure services within or
adjacent to Federal land."  No evidence is provided to replicate, test,
or confirm this conclusory statement.

128. The Supplemental Decision Memo does not provide evidence that that
the Project area is within or adjacent to an interface community
defined as follows:

> The Interface Community exists where structures directly
> abut wildland fuels. There is a clear line of demarcation
> between residential, business, and public structures and
> wildland fuels. Wildland fuels do not generally continue
> into the developed area.  The development density for an
> interface community is usually 3 or more structures per
> acre, with shared municipal services. Fire protection is
> generally provided by a local government fire
> department with the responsibility to protect the structure
> from both an interior fire and an advancing wildland fire.
> An alternative definition of the interface community
> emphasizes a population density of 250 or more people
> per square mile.

129. Instead, the Supplemental Decision Memo states: "The at-risk
communities adjacent to the Hanna Flats GNA Project Area listed in
the August 2001 Federal Register notice include Lamb Creek and

Nordman (see figure 3)."  However, Figure 3 shows that Nordman is several miles away from the northern boundary of the Project area, with National Forest lands between the Project area and Nordman. Figure 3 also shows that even at the southern most tip of the Project area boundary, there are still areas of National Forest lands outside the Project area between the Project area and Lamb Creek.

130. Moreover, the Supplemental Decision Memo is intentionally misleading because the list of communities in the Federal Register includes all three categories of "urban wildland interface communities," i.e. (1) "interface community," (2) "intermix community," and (3) "occluded community."  Only the first category – "interface community" may be used under the HFRA, and it is the "definition" – not any list – that is incorporated in the HFRA.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

The Forest Service has failed to demonstrate compliance with the Access Amendment, in violation of the Forest Plan, NFMA, NEPA, HFRA, and the APA.

131. All above paragraphs are incorporated by reference.

132. The Forest Service is allowing a temporary increase in *open* roads by allowing known illegal public motorized use to continue on at least 30 miles

of roads during Project planning and implementation.

133.   A temporary increase in *open* roads is only permitted by the Access

Amendment under certain specific circumstances:

> (1) "immediately following completion of all mechanized harvest and
>
> post-harvest slash activities requiring use of the road,"
>
> (2) in the year that work is finished, and
>
> (3) for the time period  June 16 - August 31.

134.   The temporary illegal and known public use on at least 30 miles of road for

multiple years during Project planning and implementation does not comply

with any of these three unequivocal restrictions for lawful temporary *open*

road increases.

135.   Thus, the Forest Service is violating the Access Amendment by allowing

*unlawful* temporary increases in *open* roads.

136.   Additionally, the Forest Service is allowing a temporary increase in *total*

roads by allowing known illegal public motorized use to continue on over 30

miles of roads that were admittedly not included in the Access Amendment

total road baseline.

137.   A temporary increase in *total* roads is only permitted by the Access

Amendment under certain specific circumstances:  the roads must be both (1)

"effectively gated" and (2) "restricted with a CFR closure clarifying they are

not open for public use."

138.   The 30 miles of unauthorized roads in the Priest BORZ are not effectively gated.

139.   Thus, the Forest Service is violating the Access Amendment by allowing *unlawful* temporary increases in *total* roads.

140.   Finally, the Forest Service is not complying with the Access Amendment total road requirement that states: "Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels contained in table 26."

141.    As noted above, the existing condition for the Priest BORZ, including unauthorized roads,  is 373.3 miles of total roads, and the Project will result in a net reduction of 1.2 miles of total roads.

142.   Thus, upon Project completion, linear miles of total roads in the Priest BORZ would be 372.1 miles.

143.   Forest Plan Table 26 sets the total road baseline for the Priest BORZ at 316.4 miles.

144.   Thus, the Forest Service is violating the requirement that "linear miles of total roads would be returned to or below the baseline levels contained in table 26."

145.   Even if all unauthorized roads were barricaded in a manner that complies

with the Access Amendment – which they have not been – the post-Project condition will still be 338.8 miles of total roads, which also violates the Access Amendment baseline of 316.4 miles.

146. As noted above, in April 2021, the Forest Service attempted to change the Forest Plan Access Amendment baseline – i.e. the most important substance of the Access Amendment for BORZ areas – with a note "To: Project File." This note-to-self has no legal effect. It is well-established that "if the Forest Service thinks any provision of the [Forest] Plan is no longer relevant, the agency should propose amendments to the [Forest] Plan altering its standards, in a process complying with NEPA and NFMA, rather than discount its importance in environmental compliance documents." *Native Ecosystems Council v. U.S. Forest Serv,* 418 F.3d 953, 961 (9th Cir. 2005).

147. In order to comply with NEPA, because the Access Amendment was analyzed and authorized with an EIS and a supplemental EIS, any additional changes to the Access Amendment now must also be analyzed in a supplemental EIS and authorized with a new Record of Decision. 40 C.F.R. §1502.9.

148. Additionally, in order to comply with NFMA, the the Forest Service must follow the 2012 NFMA planning regulations for a Forest Plan amendment. 36 C.F.R. §219.13. The regulations state: "a plan amendment is required to

add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area []. 36 C.F.R. §219.13 (a).  The regulations set forth detailed requirements for amendments.  In violation of NFMA and its regulations, the Forest Service did not follow the requirements for a forest plan amendment.

149.  Instead, the Forest Service represents that its attempt to change the most significant BORZ provision in the Access Amendment is simply an "administrative change."  This representation is contrary to the plain language of the statutory definition of "administrative change," which includes only "corrections of clerical errors," "conformance of the plan to new statutory or regulatory requirements," or "changes to other content in the plan (§ 219.7(f))."  36 C.F.R. §219.13 (c).  "Other content in the plan" is a term of art defined by § 219.7(f) to include "watershed(s) that are a priority for maintenance or restoration," "the plan area's distinctive roles and contributions within the broader landscape," "the monitoring program required by § 219.12," and "information reflecting proposed and possible actions that may occur on the plan area during the life of the plan." 36 C.F.R. § 219.7(f).  Changing a road density standard in habitat for an imperiled grizzly population does not fall within any of these categories.

150.  The Forest Service's failure to demonstrate compliance with the Access

Amendment in each of the three ways discussed above amounts to three separate violations of the Forest Plan, which violates NFMA.

151.   Additionally, the Forest Service's failure to comply with its Forest Plan violates the requirement of the HFRA insect and disease categorical exclusion, which states: "All projects and activities carried out under this section *shall be consistent with the land and resource management plan* established under section 1604 of this title for the unit of the National Forest System containing the projects and activities." 16 U.S.C. §6591b (e)(emphasis added).  Therefore, this categorical exclusion is unavailable for this Project, and the Forest Service may not rely on this categorical exclusion to justify its failure to prepare an EA or EIS for this Project.  The agency's failure to prepare an EA or EIS for the Hanna Flats Project thus violates NEPA and the HFRA.

152.   Additionally, the Forest Service's failure to demonstrate compliance with its Forest Plan and its failure to fully and fairly inform the public on this issue violates NEPA.  The Forest Service did not disclose to the public all applicable requirements of the Access Amendment, did not disclose the actual known existing condition of miles of motorized use in the Priest BORZ, and did not disclose the fact that the existing during-Project, and/or post-Project condition will violate the Access Amendment in three separate

ways.  Instead, the Forest Service provided an analysis to the public that was misleading, inadequate, and/or false in violation of NEPA.

153.  Finally, the Forest Service's failure to issue a decision that is in accordance with law and procedures required by law is a violation of the APA

## SECOND CLAIM FOR RELIEF

The Forest Service has failed to establish that this Project is in "wildland urban interface" as defined under the HFRA; therefore it has not established that it may categorically exclude this Project from NEPA analysis and administrative review. The Supplemental Decision Memo does not comply with the remand order in *Hanna Flats I* regarding this issue.

154.  All above paragraphs are incorporated by reference.

155.  The Forest Service categorically excluded this Project from analysis in an Environmental Assessment or Environmental Impact Statement, and categorically excluded this Project from administrative review, under 16 U.S.C. §§ 6591b (a)(1),(2).

156.  16 U.S.C. § 6591b requires:  "A project under this section shall be limited to areas – (A) in the wildland-urban interface; or (B) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface."  *Id* at (c)(2).

157.  The Forest Service's analysis for the Project states that "the entire project

area is in the wildland-urban interface . . . ."

158.   The Forest Service's analysis for the Project does not state that the Project is

located in an area with "Condition Classes 2 or 3 in Fire Regime Groups I,

II, or III."

159.   The HFRA defines wildland urban interface:

The term "wildland-urban interface" means--

(A) an area *within or adjacent to an at-risk community* that is identified in
recommendations to the Secretary *in a community wildfire protection plan*;

 or

(B) in the case of any area for which a community wildfire protection plan is
not in effect–

   (i) an area extending ½ -mile from the boundary of an at-risk
   community;

   (ii) an area within 1 ½ miles of the boundary of an at-risk community,
   including any land that–

      (I) has a sustained steep slope that creates the potential for
      wildfire behavior endangering the at-risk community;

      (II) has a geographic feature that aids in creating an effective
      fire break, such as a road or ridge top; or

      (III) is in condition class 3, as documented by the Secretary in
      the project-specific environmental analysis; and

   (iii) an area that is adjacent to an evacuation route for an at-risk
   community that the Secretary determines, in cooperation with the
   at-risk community, requires hazardous fuel reduction to provide safer
   evacuation from the at-risk community.

16 U.S.C. § 6511 (16)(emphases added).

160.  There is a community wildfire protection plan in place for Bonner County.

161.  The HFRA defines "at-risk community:"

> The term "at-risk community" means an area--
>
> (A) that is comprised of--
>
> (i) an *interface community as defined in* the notice entitled "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire" issued by the Secretary of Agriculture and the Secretary of the Interior in accordance with title IV of the Department of the Interior and Related Agencies Appropriations Act, 2001 (114 Stat. 1009) *(*66 Fed. Reg. 753, January 4, 2001); or
>
> (ii) a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land;
>
> (B) in which conditions are conducive to a large-scale wildland fire disturbance event; and
>
> (C) for which a significant threat to human life or property exists as a result of a wildland fire disturbance event.

16 U.S.C. § 6511 (1) (emphasis added).

162.  The notice entitled "Wildland Urban Interface Communities Within the

Vicinity of Federal Lands That Are at High Risk From Wildfire" defines

three different categories of communities:

> **Category 1. Interface Community**
>
> The Interface Community exists where structures directly abut wildland fuels. There is a clear line of demarcation between

residential, business, and public structures and wildland fuels. Wildland fuels do not generally continue into the developed area. The development density for an interface community is usually 3 or more structures per acre, with shared municipal services. Fire protection is generally provided by a local government fire department with the responsibility to protect the structure from both an interior fire and an advancing wildland fire. An alternative definition of the interface community emphasizes a *population density of 250 or more people per square mile*.

### Category 2. Intermix Community

The Intermix Community exists where structures are scattered throughout a wildland area. There is no clear line of demarcation; wildland fuels are continuous outside of and within the developed area. The development density in the intermix ranges from structures very close together to one structure per 40 acres. Fire protection districts funded by various taxing authorities normally provide life and property fire protection and may also have wildland fire protection responsibilities. An alternative definition of intermix community emphasizes *a population density of between 28-250 people per square mile*.

### Category 3. Occluded Community

The Occluded Community generally exists in a situation, often within a city, where structures abut an island of wildland fuels (e.g., park or open space). There is a clear line of demarcation between structures and wildland fuels. The development density for an occluded community is usually similar to those found in the interface community, but the occluded area is usually less than 1,000 acres in size. Fire protection is normally provided by local government fire departments.

Urban Wildland Interface Communities Within the Vicinity of Federal Lands

That Are at High Risk From Wildfire, 66 Fed Reg 751, 753 (Jan. 4, 2001),

2001 WL 7426.

163.   The Bonner County Plan does not use the definition of "at-risk community"

from the HFRA to define and map its wildland urban interface.

164.   The Bonner County Plan does not use the definition of "interface

community" from the 66 Fed. Reg. 753 to define and map its wildland urban

interface.

165.   As noted above, the definition of interface community is "[t]he Interface

Community exists where structures directly abut wildland fuels. There is a

clear line of demarcation between residential, business, and public structures

and wildland fuels. Wildland fuels do not generally continue into the

developed area. The development density for an interface community is

usually 3 or more structures per acre, with shared municipal services. Fire

protection is generally provided by a local government fire department with

the responsibility to protect the structure from both an interior fire and an

advancing wildland fire. An alternative definition of the interface community

emphasizes a population density of 250 or more people per square mile." 66

Fed. Reg. 753,  2001 WL 7426

166.   The Bonner County Plan uses the following definition to map its wildland

urban interface:  "an area where developed lands interact with undeveloped

lands and includes the infrastructure and natural resources communities rely

on for existence.  Location: It is found in remote scattered development areas to highly developed urban areas and everywhere in between."

167.   The Forest Service used the Bonner County Plan wildland urban interface definition and map for the Project.

168.   The Forest Service did not independently map "at-risk community" as defined in the HFRA for the Project.

169.   The Forest Service did not independently map "interface community" as defined by 66 Fed. Reg. 753 for the Project.

170.   The definition and map of wildland urban interface used by the Forest Service for the Project is not consistent with the statutory definition under the HFRA and 66 Fed. Reg. 753.

171.   The Forest Service's failure to use the definition required by the HFRA violates the HFRA and renders its use of the HFRA categorical exclusion unlawful.  Because this categorical exclusion does not apply to this Project area, the Forest Service's failure to provide NEPA analysis in the form of an Environmental Assessment or Environmental Impact Statement violates NEPA and the APA.

172.   In prior litigation (*Hanna Flats I*), this Court issued summary judgment in Plaintiff's favor on this claim.

173.   This Court remanded to the Forest Service and suspended implementation of

the Project.

174.   The Forest Service argues that the May 28, 2021 Supplemental Decision

Memo complies with the Court's remand order, and based on that unilateral

decision, the Forest Service will allow Project activities to start as soon as

July 2, 2021.

175.   However, the Supplemental Decision Memo does not comply with the

remand order, and therefore it is unlawful for Project activities to commence

because the Forest Service still refuses to map "interface community" as that

term is defined in the Federal Register. 66 Fed. Reg. 753,  2001 WL 7426.

Additionally, the Forest Service still refuses to map the alternative option: "a

group of homes and other structures with basic infrastructure and services

(such as utilities and collectively maintained transportation routes) within or

adjacent to Federal land."  Without a map of one of these definitions that

conclusively establishes the Project area is actually within the HFRA

wildland urban interface, the Project must remain suspended.  Alternatively,

the Forest Service could simply prepare an Environmental Assessment or

Environmental Impact Statement in a  NEPA process to re-approve the

Project.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiff requests that this Court award the following relief:

A.    Declare that the Project violates the law;

B.    Either vacate the Project Decision or enjoin implementation of the Project;

C.    Award Plaintiff its costs, expenses, expert witness fees, and reasonable attorney fees under EAJA; and

D.    Grant Plaintiff any such further relief as may be just, proper, and equitable.


DATED this 7th Day of June, 2021.


*/s/Rebecca K. Smith*
REBECCA K.  SMITH
Public Interest Defense Center, P.C.

Attorney for Plaintiff