UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | Case No. 2:21-CV-00244-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| KIMBERLY PIERSON, Idaho Panhandle National Forest Supervisor, and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, | |
| Defendants. | |

## INTRODUCTION

Before the Court is Plaintiff's motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. 3). The Court held a hearing on the motion on July 12, 2021. For the reasons discussed below, the Court will grant the motion.

## BACKGROUND

At issue in this case is the Hanna Flats Logging Project. The Project area is located in the Priest Lake Ranger District of the Idaho Panhandle National Forest,

within the Priest Geographic Area, and is approximately 25 miles north of Priest River, Idaho. The Priest Geographic Area is, in turn, located in Boundary County, Idaho; Bonner County, Idaho; and Pend Oreille County, Washington; and is bounded on the north by the Canadian Border. The Project includes 1,843 acres of commercial logging, 360 acres of precommercial logging, and 149 acres of prescribed burning only. Approximately 1,109 acres of the commercial logging is "regeneration harvest," meaning clear cutting or modified clear cutting. The Project also includes temporary road construction, excavated skid trail construction, and road maintenance.

### A. Initial Decision Memo and the Previous Action (*Hanna Flats I*)

On October 22, 2018, Defendant United States Forest Service issued a Decision Memo ("Initial Decision Memo") approving the Hanna Flats Logging Project. In a previous action, Plaintiff, Alliance for the Wild Rockies (AWR) challenging the Initial Decision under the Administrative Procedures Act (APA) and the Endangered Species Act (ESA). *See Alliance for the Wild Rockies v. Higgins*, Case No. 2:19-cv-00332-REB, 2021 WL 1630546 (D. Idaho) (*Hanna Flats I*). In that case, AWR contended that, in approving the Project, the USFS violated the Healthy Forest Restoration Act (HFRA) and the National

Environmental Policy Act (NEPA).[1] *Hanna Flats I*, 2021 WL 1630546, at *1.

AWR requested that the Initial Decision approving the Project be vacated or that

implementation of the Project be enjoined pending compliance with the law. *Id.*

Following the filing of *Hanna Flats I*, the USFS completed a Supplemental

Information Report that determined additional NEPA analysis was not necessary

because the Project was categorically excluded from NEPA analysis. Specifically,

the USFS took the position that the because the entire Project area was designated

as "wildland urban interface" in the Bonner County wildfire protection plan, the

Project area fell within the definition of "wildland-urban interface" under HFRA

and the Project was therefore categorically excluded from the NEPA process. *Id.* at

*1-*2.

Magistrate Judge Bush, who was presiding over the case, rejected the

USFS's position, holding that the USFS violated HFRA because it failed to use

HFRA's statutory definition of wildland-urban interface in determining that the

Project was categorically exempt from the NEPA process, and that this failure

rendered the USFS's use of the categorical exclusion unlawful. *Id.* at *12-*15.

---

[1] AWR also contended that the USFS violated the Forest Plan Access Amendment and thus violated the ESA, the National Forest Management Act, the Healthy Forest Restoration Act, NEPA, and the APA.

Judge Bush specifically noted he could not

> read out HFRA's explicit incorporation of at-risk communities in the
> definition of wildland-urban interface, or ignore HFRA's
> simultaneous definition of at-risk communities themselves. To be
> clear, this is not to say that community wildfire protection plans are
> not important and cannot be relied upon when assessing wildland-
> urban interfaces – just the opposite; after all, they too are specifically
> integrated into the definition of a wildland-urban interface. But a
> wildfire protection plan's utility presumes its synergy with HFRA
> such that, where it does not coincide with HFRA (e.g., when it defines
> wildland-urban interface differently than HFRA does), it cannot then
> operate as justification for a categorical exclusion under HFRA.
> Otherwise, a local county could designate their entire county as
> wildland-urban interface in a community wildfire protection plan, and
> then use that designation as the basis to categorically exclude logging
> projects throughout the county without the protections of NEPA. . . .
>
> In sum, it is unclear how the wildland-urban interface
> was defined here so that it could be confirmed that the
> Project sits within such an area and therefore qualifies for a
> categorical exclusion. At the very least, the statutory definition of
> wildland-urban interface was not used; as a result, the USFS
> violated HFRA, rendering its use of the categorical exclusion
> unlawful.

*Id*. at *14-*15 (internal citations and footnote omitted).

Judge Bush therefore granted summary judgment on this narrow issue in

favor of AWR and remanded the action to the USFS with instructions for the

USFS to revisit/review its claim that the entire Project area was within the

wildland-urban interface and issue a supplemental decision memo that clearly:

> (1) states how the wildland-urban interface is defined; (2) applies the
> wildland-urban interface (using the supplied definition) to a map that

concurrently and definitively depicts the Project area; and (3) explains
how the Project area falls within the wildland-urban interface under
HFRA.

*Id.* at *16. Judge Bush suspended the Project until the review was completed, and

the supplemental Decision Memo was issued, with the USFS to provide a 30-day

notice before beginning or resuming any Project-related implementation activities.

*Id.* Judge Bush also instructed the parties that if AWR sought to challenge the

Project following remand, it was to do so by filing a separate action. *Id.* at *2 n.6.

## B. Supplemental Memo and the Present Action (*Hanna Flats II*)

On May 28, 2021, the USFS issued a Supplemental Memo.[2] On June 1,

2021, the USFS informed AWR that it had complied with the remand order in

*Hanna Flats I* and that it may begin logging under the Project as soon as July 2,

2021.[3]

On June 7, 2021, AWR filed the present action (*Hanna Flats II*), alleging

_____

[2] The May 28, 2021, Supplemental Memo is designated as the USFS's Supplemental Decision Memo. However, AWR argues that the Supplemental Memo does not meet the NEPA requirements for a supplemental decision memo. The Court need not reach that issue because, as discussed below, there are serious questions as to whether the Supplemental Memo is sufficient to support the USFS determination that the entire Project area is within the wildland-urban interface as required under HFRA for categorical exclusion from NEPA. Thus, the Court will assume, for purposes of deciding the present motion, that the Supplemental Memo meets NEPA's requirements for a supplemental decision memo.

[3] The USFS subsequently stated in its briefing, and confirmed during the July 12, 2021, hearing, that it will not allow operations on the Project to begin until August 2, 2021.

that the Project is unlawful as currently authorized under the Initial Decision Memo and the Supplemental Memo. (Dkt. 1.) AWR alleges that the final decision approving the Project is arbitrary and capricious, an abuse of discretion, and/or is otherwise in violation of NEPA, the NFMA, and the APA.

On June 8, 2021, AWR filed a motion for preliminary injunction and/or temporary restraining order, seeking to maintain the status quo until the Court has an opportunity to issue a final decision on the merits of this case. That motion for preliminary injunction and/or temporary restraining order is currently before the Court for decision.

## LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits, while the purpose of a temporary restraining order is to preserve the status quo until a hearing may be held on the appropriateness of a preliminary injunction. *See Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001); *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006). Both remedies are extraordinary and should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The standards for both a temporary restraining order and a preliminary

injunction are the same. The plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id*. at 20. "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks omitted).

"For the purposes of injunctive relief, 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). "Serious questions are substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Id.* (citation and internal quotation marks omitted). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (citation omitted).

# ANALYSIS

## A.    There are serious questions going to the merits.

Under HFRA, a qualifying forest restoration treatment project may be categorically excluded from the requirements of NEPA. *See* 16 U.S.C. § 6591b(a), (b), (c). However, to fall within this categorical exclusion, the project must meet certain, delineated requirements, including that the project area be located in either (1) "the wildland-urban interface" or (2) in specified fire regime groups outside the wildland-urban interface. 16 U.S.C. § 6591b(a), (b), (c)(2)(A), (B). Here, the USFS contends that the Project falls within the first category—that the Project area is entirely within the wildland-urban interface—and that the Project is therefore categorically excluded from NEPA.

HFRA defines the "wildland-urban interface," in relevant part, as an area "within or adjacent to" a community that is an "at-risk community that is identified in . . . a community wildlife protection plan."[4] 16 U.S.C. § 6511(16).

---

[4] The full HFRA definition of a "wildland-urban interface" is:

(A) an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan; or

(B) in the case of any area for which a community wildfire protection plan is not in effect--

(Continued)

An "at-risk community" is, in turn, defined by HFRA, in relevant part, as an area that is comprised of either (i) an "interface community" as defined by 66 Fed. Reg. 753 <u>or</u> (ii) "a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land."[5] 16 U.S.C. § 6511(1).

---

(i) an area extending ½ -mile from the boundary of an at-risk community;

(ii) an area within 1 ½ miles of the boundary of an at-risk community, including any land that--

(I) has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community;

(II) has a geographic feature that aids in creating an effective fire break, such as a road or ridge top; or

(III) is in condition class 3, as documented by the Secretary in the project-specific environmental analysis; and

(iii) an area that is adjacent to an evacuation route for an at-risk community that the Secretary determines, in cooperation with the at-risk community, requires hazardous fuel reduction to provide safer evacuation from the at-risk community.

16 U.S.C. § 6511(16).

[5] The full HFRA definition of "at-risk community" is one

(A) that is comprised of--

(i) an interface community as defined in the notice entitled "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire" issued by the Secretary of Agriculture and the Secretary of the Interior in accordance with title IV of the Department of the Interior and Related Agencies Appropriations Act, 2001 (114 Stat. 1009) (66 Fed. Reg. 753,

(Continued)

### 1. Wildland-Urban Interface

In the Supplemental Memo, the USFS explains that it determined that the project area falls within the wildland-urban interface under HFRA because the project area "is entirely within the Bonner County WUI [wildland-urban interface] as it is defined in the County's CWPP [community wildfire protection plan] . . . ." (Dkt. 3-2 at 7.) In other words, the USFS relies exclusively on the Bonner County CWPP's determination of the wildland-urban interface in determining that the Project area is within the wildland-urban interface. Notably missing from the Supplemental Memo is any analysis of the Project area using HFRA's definition of the wildland-urban interface, *see* 16 U.S.C. § 6511(16), including whether the Project area is in or adjacent to an "at-risk community" as defined by HFRA, *see* 16 U.S.C. § 6511(1), (16).

---

January 4, 2001); or

    (ii) a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land;

(B)    in which conditions are conducive to a large-scale wildland fire disturbance event; and

(C)    for which a significant threat to human life or property exists as a result of a wildland fire disturbance event.

16 U.S.C. § 6511(1).

The USFS thus, once again, failed to apply HFRA's definition of wildland-urban interface in determining whether the Project area is excluded from the NEPA requirements. Instead, the USFS relied exclusively on Bonner County's community wildfire protection plan's determination of the wildland-urban interface. As explained in *Hanna Flats I*, Bonner County's CWPP uses a definition that is inconsistent with HFRA's definition of the wildland-urban interface. 2021 WL 1630546, at *14. Although a county's wildfire protection plan can be relied upon in assessing the wildland-urban interface, where, as here, a wildfire protection plan defines the wildland-urban interface differently than HFRA, the wildfire protection plan definition cannot provide the "justification for a categorical exclusion under HFRA." *Id.*

The USFS's exclusive reliance on the Bonner County CWPP's definition of the wildland-urban interface, and failure to conduct an analysis using the HFRA definition, raise serious questions regarding the USFS's determination that the Project is categorically excluded from NEPA requirements and whether the USFS failed to comply with the remand instructions.

The USFS asserted during the July 12, 2021, hearing, that the needed analysis that demonstrates that the Project area is in the wildland-urban interface under HFRA is contained within the Bonner County 2017 Hazard Mitigation Plan,

which incorporates the Bonner County CWPP. In support, the USFS cited to the

Administrative Record at FS32304, which is the USFS's Supplemental Memo.

(*See* AR FS32304.) The Supplemental Memo, in turn, cites to the Bonner County

2017 Hazard Mitigation Plan, and specifically to the portion of the Hazard

Mitigation Plan located at AR FS30030-30052. This portion of the Hazard

Mitigation Plan discusses general hazardous conditions in Bonner County.

Relevant to the present case, the Hazard Mitigation Plan states that Bonner County

adopted the following definition of wildland-urban interface:

> WUI Definition – Is an area where developed lands interact with
> undeveloped lands and includes the infrastructure and natural
> resources communities rely on for existence.
>
> Location – It is found in remote scattered development areas to highly
> developed urban areas and everywhere in between.

AR FS030047. This definition is followed by the "rationale" for the adoption of

the definition. (*See id.*) Nowhere in that rationale is an analysis of, or application

of, HFRA's definition of the wildland-urban interface, or HFRA's definition of

"at-risk community." (*See* AR FS030048-52.) Instead, the rationale is limited to a

discussion of the hazards of wildfire and the high risk of wildfire to Bonner

County, and concludes that "the majority of the communities in Bonner County

[have been designated] at high risk of wildfire . . ." and that "all areas are at high

risk to wildfire." (AR FS30050.)

Thus, the Hazard Mitigation Plan engages in an examination of whether areas of Bonner County, including communities located therein, are at risk of wildfire. Missing, however, from both the Hazard Mitigation Plan and the USFS's Supplemental Memo, is any discussion or analysis of the Project area using HFRA's definition of the wildland-urban interface, including whether the Project area is in or adjacent to an at-risk community as defined by HFRA. (*See* AR FS32304, FS030030-52.)

The USFS contends that HFRA's definition of wildland-urban interface does not require that a community meet the "at-risk community" definition, and that it is enough if the community is identified as at risk by a community wildfire protection plan. The USFS would thus have the Court read HFRA's definition of the wildland-urban interface as requiring that the community be *either* an at-risk community *or* be identified in a community wildfire protection plan. The Court rejects this approach because it is inconsistent with the plain language of HFRA, which defines the wildland-urban interface, in relevant part, as an area within or adjacent "to an at-risk community that is identified in" a community wildfire protection plan. 16 U.S.C. § 6511(16); *see Hanna Flats I*, 2021 WL 1630546, at *14 (explaining that the HFRA wildland-urban interface definition explicitly and simultaneously incorporates the HFRA's definition of "at-risk communities"). This

plain language requires that, to fall within the HFRA definition of the wildland-urban interface, the area must be within or adjacent to an at-risk community *and* the at-risk community must be identified in a community wildfire protection plan. 16 U.S.C. § 6511(16).

### 2. At-Risk Communities

The USFS argues that the Supplemental Memo demonstrates that the communities of Nordman and Lamb Creek[6]—both of which are mapped and identified in the Supplemental Memo—comply with the HFRA definition of "at-risk community" set out in both subsection (i) and subsection (ii) of § 6511(1)(A). The Court disagrees.

#### a. Subsection (i)

Turning first to subsection (i), this subsection defines an "at-risk community" as including "an interface community as defined in" 66 Fed. Reg. 753 ("Wildland Urban Interface Communities notice"). 16 U.S.C. § 6511(1)(A)(i). An "interface community" is, in turn, defined by 66 Fed. Reg. 753 as one "where

---

[6] Although the USFS also cites to Priest Lake/Priest Lake Ranger Station, the Supplemental Memo only lists the at-risk communities included in the Federal Register as Lamb Creek and Nordman; it does not include Priest Lake/Priest Lake Ranger Station. (*See* Dkt. 6-1 at 6, 7.) The USFS's reliance on Priest Lake/Priest Lake Ranger Station is therefore rejected. *See Burlington Truck Lines, Inc., v. United States*, 371 U.S. 156, 168-69 (1962) (agency's decision must "be upheld, if at all, on the same basis articulated" by the agency in that decision).

structures directly abut wildland fuels," and where there are "usually 3 or more structures per acre, with shared municipal services," or a "population density of 250 or more people per square mile."[7] 66 Fed. Reg. 753. The Federal Register lists three categories of communities in the "urban wildland interface," only one of which is "interface communities. 66 Fed. Reg. 752-53. The other two categories of urban wildland interface communities are "intermix communities" and "occluded communities. 66 Fed. Reg. 753. The Federal Register goes on to provide an "Urban Wildland Community List" but does not designate into which of the three categories each of the listed communities falls. *See* 66 Fed. Reg. 753; *see also* 66 Fed. Reg. 43384 (noting that is an updated list to the initial list in 66 Fed. Reg. 751). In other words, a community can be included on the list if it is either an interface community, an intermix communities, or an occluded community, and there is no designation into which category each community falls.

---

[7] The full definition is as follows:

The Interface Community exists where structures directly abut wildland fuels. There is a clear line of demarcation between residential, business, and public structures and wildland fuels. Wildland fuels do not generally continue into the developed area. The development density for an interface community is usually 3 or more structures per acre, with shared municipal services. Fire protection is generally provided by a local government fire department with the responsibility to protect the structure from both an interior fire and an advancing wildland fire. An alternative definition of the interface community emphasizes a population density of 250 or more people per square mile.

66 Fed. Reg. 753.

The USFS claims that subsection (i)'s definition of an at-risk community applies to the communities of Nordman and Lamb Creek, but the Supplemental Memo fails to actually apply that definition. Instead, the USFS simply notes that the communities of Nordman and Lamb Creek are included in the *list* of communities identified in 66 Fed. Reg. 43384, which, as noted, provides an update to the *list* of communities in 66 Fed. Reg. 753. However, as noted above, this list is not limited to interface communities, but also includes intermix communities and occluded communities. Thus, the mere fact that the communities of Norman and Lamb Creek are include on the list of communities does not demonstrate that they are interface communities as required under subsection (i)'s definition of an at-risk community.

Moreover, subsection (i)'s definition does not incorporate the *list* of communities contained in 66 Fed. Reg. 751 (or the updated list in 66 Fed. Reg. 43384). Instead, the definition provides that, to be an at-risk community, that community must fall within the *definition* of interface community as set forth at 66 Fed. Reg. 753. *See* 16 U.S.C. § 6511(1)(A)(i).

In sum, that a specific community is *listed* in 66 Fed. Reg. 753, or in the update provided by 66 Fed. Reg. 43384, is insufficient to make the community an "at-risk community" under subsection (i)'s definition. Instead, subsection (i)

requires that the community meet the *definition* of an interface community set out

at 66 Fed. Reg. 753. The Supplemental Memo fails to apply this "interface

community" definition. Thus, the Supplemental Memo is insufficient to

demonstrate that the communities of Nordman and Lamb Creek are "at-risk

communities" under HFRA.[8]

---

[8] The USFS cites to *Alliance for the Wild Rockies v. Marten*, 464 F. Supp. 3d 1169, 1177 (D. Mont. 2020) in support of their contention that subsection (ii)' definition of "at-risk community" extends not only to interface communities, but also to intermix communities and occluded communities. In *Marten*, the court found that an intermix community qualifies as an at-risk community under HFRA:

> HFRA defines a "wildland-urban interface" as "an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary in a community wildfire protection plan." 16 U.S.C. § 6511(16)(A). An "at-risk community" is further defined as
>
>> an area ... that is comprised of ... an interface community as defined in the notice entitled 'Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire' issued by the Secretary of Agriculture and the Secretary of the Interior in accordance with [T]itle IV of the Department of the Interior and Related Agencies Appropriations Act, 2001 (114 Stat. 1009) (66 Fed. Reg. 753, January 4, 2001).
>
> § 6511(1). The cited Federal Register notice, in turn, explains that three types of communities—interface, intermix, and occluded—qualify as "urban wildland interface" communities. 66 Fed. Reg. 751, 753 (Jan. 4, 2001). Contrary to Alliance's contention, the Tri-County Regional Community's status as an "intermix" community would not preclude application of the categorical exclusion to the Willow Creek Project.

464 F. Supp. 3d at 1177.

Respectfully, this Court disagrees with this conclusion in the *Marten* decision. The HFRA definition of at-risk community under subsection (i) explicitly states that an at-risk community is "an interface community as defined in" 66 Fed. Reg. 753. And 66 Fed. Reg. 753 (Continued)

### b.  Subsection (ii)

Turning to subsection (ii), this subsection defines an "at-risk community" as including "a group of homes and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land." 16 U.S.C. § 6511(1)(A)(ii). The USFS argues that subsection (ii) applies here "because Bonner County found that the majority of these communities [Nordman and Lamb Creek] are all at-risk communities identified in the Federal Register," and the "Decision Memo also notes that these rural areas are at high risk of wildfire and cites Bonner County's analysis of data." (Dkt. 10 at 13; *see* Dkt. 3-1 at 2 (Supplemental Memo).) The USFS's argument fails for several reasons.

First, just because Bonner County, and the Bonner County CWPP, has

---

provides a distinct, separate definition for an "interface community," as opposed to an "intermix community," and an "occluded community." This explicit incorporation of the definition of "interface community" in subsection (i) demonstrates an intent to distinguish between the three categories of communities listed in 66 Fed. Reg. 753, and to include only "interface communities" as at-risk communities under HFRA, and exclude the other two categories of communities listed in 66 Fed. Reg. 753. Further, if, as the *Marten* decision found, subsection (i) was intended to incorporate all three categories of urban wildland interface communities, rather than only those defined as "interface communities," Congress could have easily done so. It did not, and this Court declines to go beyond the plain language of subsection (i) to infer such an intention. *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *see also  Colautti v. Franklin*, 439 U.S. 379, 392-393, n.10 ("As a rule, 'a definition which declares what a term "means" ... excludes any meaning that is not stated' ").

identified a community as "at risk," does not mean that the community falls within the definition of an at-risk community under subsection (ii).[9]

Second, to be an at-risk community under subsection (ii), the community must be "within or adjacent to Federal land." 16 U.S.C. § 6511(1)(A)(ii). Here, the record demonstrates that neither of the communities relied on by the Supplemental Memo are within or adjacent to the Federal land at issue here—the Project area. Specifically, Lamb Creek is a mile away from the Project area (*see* Dkt. 10 at 2) and Nordman is approximately three miles away from the Project area (*see* Dkt. 3-1 at 6). Thus, there are, at minimum, serious questions as to whether the communities relied upon in the Supplemental Memo are "within or adjacent" to the Federal land at issue here—the Project area—as required by the definition of at-risk community under subsection (ii). *See* 16 U.S.C. § 6511(1)(A)(ii).

### 3.  Within or Adjacent to the Project Area

The USFS does not dispute that neither Nordman nor Lamb Creek border the Project area. Instead, the USFS argues that HFRA does not require the at-risk

---

[9] The Supplemental Memo asserts that the "Bonner County steering committee found that the majority of communities in Bonner County are 'at risk' communities under subsection (ii) of the HFRA definition because they consist of a group homes and structures with basic infrastructure services within or adjacent to Federal land." (Dkt. 3-1 at 2.) However, the Supplemental Memo provides no citation to the Administrative Record to support this assertion. (*See id.*)

community to border the Project area. (*See* Dkt. 10 at 14.) In support of this argument, the USFS cites 66 Fed. Reg. at 43,384, which states: "It is important to note that the urban wildland interface is not limited to communities in the vicinity of Federal land." The USFS's argument is unpersuasive.

First, subsection (ii)'s definition of an at-risk community explicitly includes the requirement that the group of homes and other structures be "within or adjacent to Federal land." 16 U.S.C. § 6511(1)(A)(ii). That the Federal Register states that the *wildland urban interface* is not limited to communities in the vicinity of Federal land does not negate the requirement that, to be an *at-risk community* under subsection (ii), the community must be "within or adjacent to Federal land." *See id.*

Second, the Federal Register statement cited by the USFS must be reviewed in the context of the surrounding language. In context, the statement reads:

> It is important to note that the urban wildland interface is not limited to communities in the vicinity of Federal land. Many States, particularly in the East, submitted revised community lists that included all interface communities in their State, regardless of their relationship to Federal land. These States felt strongly that the full, nationwide scope of the urban wildland interface problem must be conveyed.

> Due to the specificity of Congressional direction, the list set out at the end of this notice contains only those communities identified by the States or Tribes as "in the vicinity of Federal land."

66 Fed. Reg. 43384. Viewed in this context, it is clear that the statement—"the urban wildland interface is not limited to communities in the vicinity of Federal land"—merely points out that there are urban wildland interface problems all over the nation and that the problem is not limited to those areas that are in the vicinity of Federal land. Again, this statement in the Federal Register regarding the *urban wildland interface* does not in any manner negate the explicit requirement of the subsection (ii) definition that, to be an *at-risk community*, the community must be "within or adjacent to Federal land." *See* 16 U.S.C. § 6511(1)(A)(ii).

Finally, the error of the USFS's argument is made clear by a review of the distinction made by HFRA between an area that has a community wildfire protection plan and an area that does not have a community wildfire protection plan. Specifically, for an area with a wildfire protection plan, such as Bonner County, the wildland-urban interface is limited to the area "within or adjacent to an at-risk community." 16 U.S.C. § 6511(16)(A). In contrast, for an area that does not have a wildfire protection plan, the wildland-urban interface is defined as including areas up to 1 ½ miles from the boundary of an at-risk community.[10] *See* 16 U.S.C. § 6511(16)(B)(i), (ii). The use of the "within or adjacent to an at-risk community"

---

[10] It also includes areas adjacent to an evacuation route for an at-risk community under certain conditions. 16 U.S.C. § 6511(16)(B)(iii).

for those areas with a wildfire protection plan, and distances of up to 1 ½ miles

from an at-risk community for areas without a wildfire protection plan

demonstrates an intent to treat areas with fire protection plans differently from

those without a fire protection plan. *See S.E.C. v. McCarthy*, 322 F.3d 650, 656

(9th Cir. 2003) ("It is a well-established canon of statutory interpretation that the

use of different words or terms within a statute demonstrates that Congress

intended to convey a different meaning for those words.").

Bonner County has a wildfire protection plan. Thus, under the plain

language of HFRA, and contrary to the USFS's argument, the at-risk community

must be "within or adjacent to," i.e., border or "abut," the Federal land at issue,

i.e., the Project area. *See* 16 U.S.C. § 6511(1)(A)(i), (ii); 66 Fed. Reg. 753. And, to

be wildland-urban interface, the Project area must be within or adjacent to an at-

risk community. 16 U.S.C. § 6511(16)(A).

As discussed above, the communities identified in the Supplemental

Memo—Nordman and Lamb Creek—are three miles away and one mile away,

respectively, from the Project area. The communities do not, therefore, support the

USFS's determination that the Project area is entirely located within the wildland-

urban interface.

In sum, there are, at minimum, serious questions as to whether the USFS has

adequately demonstrated that the Project area falls within HFRA's statutory definition of the wildland-urban interface, and thus whether the USFS's invoking of HFRA's categorical exclusion is unlawful.

### B.    Irreparable Harm

The Court finds that AWR has also made the requisite showing that there is a likelihood that irreparable injury will result if this Project is allowed to proceed without an evaluation of the environmental impact of the Project or an adequate explanation of how the Project area qualifies for the categorical exclusion under HFRA. As discussed previously, the Project involves 1,843 acres of commercial logging, including clear cutting or modified clear cutting; 360 acres of precommercial logging; and 149 acres of prescribed burning only. The Project also includes temporary road construction, excavated skid trail construction, and road maintenance.

AWR has submitted evidence that its members use the Idaho Panhandle National Forest, including the Project area where the planned logging, burning, road and trail construction, and road use is to occur; that its members' use is for both work and recreational purposes, such as hiking, skiing, nature study, wildlife observation, quiet contemplation in nature, and other activities; that its members use these areas frequently and on an ongoing basis, and plan to continue that use into the future; and that  its members' interests will be irreparably harmed by the

Project. (*See* Dkt. 3-7 at 12.) This irreparable harm includes harming members'
ability to view, experience, and utilize the areas in an undisturbed state; and
harming members' interests in the naturally functioning ecosystems of the Forest
and the Project area, including their interests in looking for, viewing, studying, and
enjoying elk, moose, grizzly bears, lynx, bull trout, and other wildlife species
undisturbed in their natural surroundings. (*Id.*)

The Court finds that this evidence satisfies the "likelihood of irreparable
injury" requirement for issuance of preliminary injunctive relief. *See Amoco Prod.
Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) ("Environmental injury, by
its nature, can seldom be adequately remedied by money damages and is often
permanent or at least of long duration, i.e., irreparable."); *League of Wilderness
Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,
764 (9th Cir. 2014) ("The logging of mature trees, if indeed incorrect in law,
cannot be remedied easily if at all. Neither the planting of new seedlings nor the
paying of money damages can normally remedy such damage. The harm here, as
with many instances of this kind of harm, is irreparable for the purposes of the
preliminary injunction analysis."); *Cottrell*, 632 F.3d at 1135 (finding likelihood of
irreparable harm where proposed logging project area was used by the plaintiff's
members "for work and recreational purposes, such as hunting, fishing, hiking,

horseback riding, and cross-country skiing" and the project would harm plaintiff's

members' ability to "view, experience, and utilize" the project area in an

undisturbed state); *see also High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630,

642 (9th Cir. 2004) ("In the NEPA context, irreparable injury flows from the

failure to evaluate the environmental impact of a major federal action.").

### C.    Public Interest and Balance of Equities

Finally, the Court recognizes that there are strong public interests on both

sides but finds that the public interest and balance of equities tip in favor of AWR

and support the issuance of preliminary injunctive relief.[11]

There is a "broad[] public interest in the preservation of the forest and its

resources." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1308 (9th Cir.

2003). Allowing the potentially environmentally damaging Project to proceed

without an adequate showing that the Project falls within HFRA's categorical

exclusion from NEPA requirements, or that NEPA requirements have been met, is

contrary to the mandate of NEPA, and is contrary to the public interest. *See Sierra

Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

---

[11] Where, as here, the Government is a party, the analyses of public interest and balance of equities merge. *See Drakes Bay Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, these last two factors [public interest and balance of equities] merge." (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The USFS has provided evidence of the public interest favoring the Project proceeding without delay, including the reduction in wildfire risk to people, private lands, and critical infrastructure; restoration of forest ecosystems and resiliency; and the provision of  local jobs and critical funding for restoration efforts. All of these factors are in the public interest. *See Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1030 (E.D. Cal. 2013) ("Reducing the risk of severe wildfire is in the public interest not only because of the threat wildfire poses to human lives and property, but also because of the threat it poses to wildlife."); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1113 (E.D. Cal. 2013) ("This Court has previously concluded both that the reduction of the risk of catastrophic wildfire is in the public interest. . . ."). And, the Court has given great consideration to these important factors. However, the Court finds that the public interest in granting the preliminary injunction, and the balance of equities, weighs in favor of granting the injunction. *See Earth Island Inst.*, 351 F.3d at 1308 ("broad[] public interest in the preservation of the forest and its resources"); *Bosworth*, 510 F.3d at 1033 (allowing project to proceed without adequate showing that NEPA requirements have been met is contrary to mandate of NEPA and contrary to public interest); *Connaughton*, 752 F.3d at 766 (balance of equities tips in favor of the plaintiffs and issuance of the preliminary injunction because the harms the plaintiffs face are

permanent while the harm faced by the public in granting the preliminary injunction was merely a temporary delay in the project, including the delay in reducing the risk of forest fires and insect infestation where such risk was not shown to be imminent); *Cottrell*, 632 F.3d at 1138-39 (public interest in preserving nature and avoiding irreparable environmental injury, in careful consideration of environmental impacts before major federal projects proceed, and having the USFS comply with required procedures, outweighed local job loss and negative impact on local economy); *cf. Earth Island Inst. v. Carlton*, No. CIV. S-09-2020 FCD, 2009 WL 9084754, at *28 (E.D. Cal. Aug. 20, 2009), *aff'd*, 626 F.3d 462 (9th Cir. 2010) (noting that it was in the public interest to allow project to proceed where the plaintiff *had not made the requisite showing on the merits* and defendants had provided evidence that if the project was delayed, there would be a safety risk to the public due to hazardous trees; the public would lose the benefit of the project's creation of local jobs, and the project's reforestation efforts that would in turn expedite forest regeneration, recover forested conditions, prevent domination of shrub species, and repair habitat structure for wildlife; and the government would lose the opportunity to receive the prime economic value of the timber and could lose the ability to do the project at all if it is delayed).

Given the strength of AWR's showing that there are serious questions going

to the merits of whether the USFS's categorical exclusion of the Project area from NEPA requirements is lawful, the strong showing of the likelihood of irreparable harm, and the strong public interest in ensuring that the Project proceed only if the USFS has complied with HFRA and NEPA, the Court finds that the balance of equities tips sharply in favor of AWR and the issuance of an injunction.

**ORDER**

**IT IS ORDERED that:**

1.      Plaintiff's Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. 3) is **GRANTED**.

2.      The Hanna Flats Project is SUSPENDED until further order of the Court.

DATED: July 23, 2021

B. Lynn Winmill
U.S. District Court Judge