# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES,<br><br>    Plaintiff,<br><br>vs.<br><br>HIGGINS, *et al.*,<br><br>    Defendants. | Case Nos.: 2:21-cv-00244-REP<br><br>**ORDER** |

Pending before the Court is Plaintiff's Renewed Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. 29). As set forth below, the Court issues a temporary restraining order to preserve the status quo pending the completion of proceedings pursuant to a preliminary injunction.

## I. BACKGROUND

On October 11, 2018, Defendant United States Forest Service ("USFS") issued a Decision Memo (the "Initial Decision Memo") authorizing the Hanna Flats Project (the "Project"). The Project is located in Bonner County on the Priest Lake Ranger District of the Idaho Panhandle National Forest. It was designed to reduce the risk or extent of insect or disease infestation and reduce the current and future risk of catastrophic wildfire to people, public and private lands, and infrastructure. The 6,814-acre Project area is dominated by dense, mixed-conifer forest stands with large amounts of surface, ladder, or canopy fuels. It authorizes various treatments on 2,352 acres, including timber harvest, prescribed fire, and reforestation. The Project also authorizes temporary road construction, excavated skid trail construction, and road maintenance.

Relevant here, the USFS issued the Initial Decision Memo under Section 603 of the Healthy Forest Restoration Act ("HFRA"), which exempts qualifying insect and disease projects in wildland-urban interfaces from the requirements of the National Environmental Policy Act ("NEPA"). As a result, no Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") was ever prepared for the Project.

A.  *Hanna Flats I* **and the Initial Decision Memo**

Plaintiff Alliance for the Wild Rockies ("Alliance") challenged the Initial Decision Memo in an earlier action before U.S. Magistrate Judge Ronald E. Bush – *Hanna Flats I*. There, Alliance argued that, in approving the Project via the Initial Decision Memo, the USFS (i) violated the Access Amendments[1] (First, Second, Third, and Sixth Claims for Relief); and (ii) failed to establish that the Project meets the statutory definition of wildland-urban interface (Fourth and Fifth Claims for Relief). On the parties' cross-motions for summary judgment, Judge Bush preliminarily concluded that Alliance's Access Amendments-related claims could not be resolved as a matter of law, owing to the constantly-evolving record relating to the USFS's and USFWS's reinitiation/conclusion of Endangered Species Act ("ESA") Section 7 consultations. *All. for the Wild Rockies v. Higgins (Hanna Flats I)*, 535 F. Supp. 3d 957, 963 n.5 (D. Idaho 2021). He in turn denied both motions for summary judgment, without prejudice, as to Alliance's First, Second, Third, and Sixth Claims for Relief. *Id*. at 963-64, 81.[2]

---

[1] The Access Amendments are Forest Plan amendments implemented by the USFS and United States Fish and Wildlife Service ("USFWS") to set standards for motorized use in habitat for the Selkirk and Cabinet-Yaak grizzly bear populations in northwestern Montana and northern Idaho. The Access Amendments apply mandatory road restrictions to National Forest lands within both the bears' official "Recovery Zones," as well as occupied habitat outside these areas (referred to as "Bears Outside Recovery Zones" or "BORZ" areas).

[2] Judge Bush observed that Alliance's wildland-urban interface-related claims remained, were "a keystone of whether the Project was properly categorically excluded from NEPA analysis," and were resolved in Alliance's favor on summary judgment (*see infra*). Accordingly,

**ORDER - 2**

Thus, *Hanna Flats I* substantively addressed only Alliance's wildland-urban interface-related claims. Defendants took the position that, because the Project area had been designated as a wildland-urban interface in the Bonner County Wildfire Protection Plans, the Project met the definition of a wildland-urban interface under HFRA and the Project was therefore categorically exempt from the NEPA process. Alliance disagreed, claiming that, while there is a categorical exclusion for wildland-urban interfaces, the USFS did not sufficiently prove that as to the Project.

After Judge Bush concluded that Alliance had standing and sufficiently exhausted its administrative remedies (other procedural arguments made by the USFS), Judge Bush agreed with Alliance and rejected Defendants' position. He found that the USFS violated HFRA because it failed to use HFRA's statutory definition of wildland-urban interface. Therefore, the USFS could not claim that the Project was categorically excluded from NEPA compliance:

> It is not enough to simply declare that the Project is within a wildland-urban interface, especially when the intended purpose of doing so – as in this case – is to avoid the requirement of preparing an EA (or EIS) as would otherwise be required under NEPA. There must be something else that connects the dots and thereby would support Defendants' position that the categorical exclusion under HFRA applies to the Project. Perhaps the foundation for claiming the categorical exclusion could have been constructed, but it was not. The Scoping Notice and the [Initial] Decision Memo – the two documents that expressly align the Project's incorporation within the wildland-urban interface with a categorical exclusion – do not define the wildland-urban interface or identify its contours so as to prove its existence atop the Project. The same criticism can be levelled against the Bonner County Wildfire Plans (from which the Scoping Notice and the [Initial] Decision Memo presumably draw upon to assert that the Project is within the wildland-urban interface), in that neither of the Wildfire Plans' wildland-urban interface demarcations is capable of verification in any meaningful way – regardless of which Wildfire Plan the USFS used for the Project. In short, simply saying that the Project is within the wildland-urban interface, without more, does not make it so.

---

Judge Bush allowed Alliance to file a separate action if necessary, based on a more developed and up-to-date record following remand. *Hanna Flats I*, 535 F. Supp. 3d at 964 n.6.

**ORDER - 3**

Even if one could reverse-engineer from these materials the definition used by the USFS to conclude that the Project is within the wildland-urban interface, it would still fail HFRA's definition for the same. That is, whatever definition (uncertain or lacking entirely) of wildland-urban interface the USFS applied to the Project, it did not clearly take into account at-risk communities as required by HFRA . . . . To state – as Defendants do – that a community wildfire protection plan (like either Bonner County's 2012 or 2016 Wildfire Plans) by itself suffices to establish a wildland-urban interface for the purpose of invoking a categorical exclusion, ignores these realities . . . . The Court must give meaning to all the words used in defining wildland-urban interface and thus cannot read out HFRA's explicit incorporation of at-risk communities in the definition of wildland-urban interface, or ignore HFRA's simultaneous definition of at-risk communities themselves.

To be clear, this is not to say that community wildfire protection plans are not important and cannot be relied upon when assessing wildland-urban interfaces – just the opposite; after all, they too are specifically integrated into the definition of a wildland-urban interface. But a wildfire protection plan's utility presumes its synergy with HFRA such that, where it does not coincide with HFRA (e.g., when it defines wildland-urban interface differently than HFRA does), it cannot then operate as justification for a categorical exclusion under HFRA. Otherwise, a local county could designate their entire county as wildland-urban interface in a community wildfire protection plan, and then use that designation as the basis to categorically exclude logging projects throughout the county without the protections of NEPA. Recognizing the importance of the public's participation in federal actions that affect the environment, this is a problem. The sideboards provided within HFRA, if followed, harmonize these and other relevant considerations.

In sum, it is unclear how the wildland-urban interface was defined here so that it could be confirmed that the Project sits within such an area and therefore qualifies for a categorical exclusion. At the very least, the statutory definition of wildland-urban interface was not used; as a result, the USFS violated HFRA, rendering its use of the categorical exclusion unlawful. Alliance's Motion for Summary Judgment (as to the Fourth Claim for Relief) is granted in this respect.

*Id*. at 977-79 (internal citations omitted).[3]

Judge Bush remanded the action to the USFS to revisit its claim that the entire Project is within a wildland-urban interface. *Id*. at 980. He required the USFS to issue a Supplemental

---

[3] Judge Bush separately denied Alliance's Fifth Claim for Relief that dealt with whether the Project constituted a "major federal action" under 40 C.F.R. § 1508.18. *Hanna Flats I*, 535 F. Supp. 3d at 975 n.15.

Decision Memo that "clearly: (i) states how the wildland-urban interface is defined; (ii) applies the wildland-urban interface (using the supplied definition) to a map that concurrently and definitively depicts the Project area; and (iii) explains how the Project area falls within the wildland-urban interface under HFRA." *Id*. at 980-81 ("The point of this exercise is to allow whatever conclusion is reached to be replicated, tested, and confirmed."). In the meantime, Judge Bush suspended the Project. *Id*.

B.  *Hanna Flats II* **and the Supplemental Decision Memo**

On May 28, 2021, the USFS issued a Supplemental Decision Memo. On June 1, 2021, the USFS informed Alliance that it had complied with Judge Bush's remand order in *Hanna Flats I* and that it may begin logging under the Project as soon as July 2, 2021.

Alliance challenged the Supplemental Decision Memo in a subsequent action before U.S. District Judge B. Lynn Winmill – *Hanna Flats II*. There, Alliance argued that the Project remained unlawful under both the Initial Decision Memo and the Supplemental Decision Memo. It alleged that (i) the USFS still failed to demonstrate compliance with the Access Amendments (First Claim for Relief); and (ii) the Supplemental Decision Memo did not comply with Judge Bush's remand order in *Hanna Flats I* and still failed to meet the statutory definition of wildland-urban interface (Second Claim for Relief) regardless. The next day, Alliance moved for a preliminary injunction and/or temporary restraining order, seeking to maintain the status quo until Judge Winmill could issue a final decision on the merits of the case.

Judge Winmill granted Alliance's motion. Applying the *Winter* factors, he concluded that there were "serious questions going to the merits," noting how the Supplemental Decision Memo (i) did not analyze how the Project satisfied HFRA's definition of wildland-urban interface, improperly relying instead on Bonner County's (a) Community Wildfire Protection Plan that simply said so, and (b) 2017 Hazard Mitigation Plan that did not discuss or analyze the

ORDER - 5

Project using HFRA's definitions; and (ii) failed to apply the proper definition of "at-risk communities" and "within or adjacent to" (components parts of the definition of a wildland-urban interface). *All. for the Wild Rockies, v. Pierson (Hanna Flats II)*, 550 F. Supp. 3d 894, 898-904 (D. Idaho 2021) ("In sum, there are, at minimum, serious questions as to whether the USFS has adequately demonstrated that the Project area falls within HFRA's statutory definition of the wildland-urban interface, and thus whether the USFS's invoking of HFRA's categorical exclusion is unlawful.").

With these serious questions going to the merits, combined with the strong showing of irreparable harm and the significant public interest in ensuring the Project complies with HFRA and NEPA, Judge Winmill found that the balance of equities tipped sharply in Alliance's favor and issued a preliminary injunction. *Id*. at 905-07.[4] The Project was once again suspended until further notice. *Id*. at 907.

### C.  The Ninth Circuit and *Petrick*

Defendants appealed both Judge Bush's summary judgment decision in *Hanna Flats I* and Judge Winmill's preliminary injunction in *Hanna Flats II*. In a single opinion, the Ninth Circuit addressed both appeals. *See Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475 (9th Cir. 2023) (hereinafter "*Petrick*").

  1.  <u>*Hanna Flats I* on Appeal</u>

The only issue resolved on appeal in *Hanna Flats I* was whether Alliance's comments during the scoping phase put the USFS on notice of the wildland-urban interface issue. The Ninth Circuit held that they did not:

---

[4] In issuing the preliminary injunction, Judge Winmill addressed only Alliance's wildland-urban interface-related claims (Second Claim for Relief). He did not address Alliance's Access Amendments-related claim (First Claim for Relief).

**ORDER - 6**

> Here, Alliance's vague and generalized statement that the district court cites, contained within more than a hundred pages of comments, did not provide sufficient notice to the government of Alliance's current concerns. That comment complains only that the definition of "wildland-urban interface" is vague and allows entities other than the general public to set [wildland-urban interface] boundaries." This may reflect a broad concern about the size of the wildland-urban interface. And it may even be a criticism of HFRA. But it is not a claim that the Forest Service has violated HFRA – the claim raised in court.
>
> . . . .
>
> Alliance did not put the Forest Service on notice about the issue that would provide the basis for Alliance's eventual claim in federal court. The district court erred in concluding otherwise.

*Id*. at 489-90. As a result, the Ninth Circuit vacated the grant of summary judgment in *Hanna Flats I* on *this* discrete issue. *Id*. at 490.

In a footnote however, the Ninth Circuit recognized an alternate argument from Alliance: that challengers need not even file an administrative objection for projects exempted from NEPA analysis with a categorical exclusion. *Id*. at 490 n.4. The Ninth Circuit left that issue for the district court to resolve on remand. *Id*. at 483 ("We remand to the district court to consider Alliance's unaddressed argument that there is no administrative-objection requirement in this context."); *id*. at 490 (same); *id*. at 490 n.4 ("[T]he issue is better left for the district court in the first instance on remand. Alliance may raise other waiver-specific arguments that the district court concludes were reasonably not made previously given the Forest Service's framing of the issue as one of exhaustion.").

2. <u>*Hanna Flats II* on Appeal</u>

Among the issues on appeal, the USFS argued that its Initial Decision Memo and Supplemental Decision Memo offered a sufficient explanation for the use of the categorical exclusion simply by noting that the Project is within the wildland-urban interface identified by the Bonner County community plan. Critically, the Ninth Circuit disagreed:

> Put simply, the Forest Service seeks to justify invoking the categorical exclusion solely because the Project fell within the wildland-urban interface designated by the Bonner County community plan. But the community plan's definition of its wildland-urban interface—on its face—deviates from HFRA and likely results in a covered area beyond what Congress authorized. Thus, in this case, the Forest Service cannot properly rely on the Bonner County community plan—alone—to justify the categorical exclusion. . . . [R]eliance on a plainly overinclusive wildland-urban interface, without more, is the sort of "clear error of judgment" that arbitrary or capricious review is meant to prevent.
>
> . . . .
>
> We thus conclude that the Project's location within the Bonner County community plan's asserted wildland-urban interface is not enough by itself to justify use of HFRA's categorical exclusion.

*Id*. at 494-95.

But the USFS also argued that its Supplemental Decision Memo (issued following remand in *Hanna Flats I*) nonetheless supplied new information confirming that the Project is, in fact, within a wildland-urban interface as defined by HFRA. According to the USFS, this new information, when considering the district court's misreading of HFRA's requirements in *Hanna Flats II*, actually showed that the Project is within a wildland-urban interface. On *this* discrete issue, the Ninth Circuit agreed. It found that the district court erred because its interpretation "is belied by HFRA's statutory language," even while acknowledging that HFRA "is not a model of clarity and contains several interrelated provisions." *Id*. at 495.

Likewise, since the district court in *Hanna Flats II* initially found a "serious question" about the validity of the categorical exclusion due to an incorrect interpretation of HFRA in the first instance, the Ninth Circuit vacated the preliminary injunction (without considering any of the other *Winter* factors). *Id*. at 496-98 ("Because the preliminary injunction was based on a legal error, we vacate it."). Still, the Ninth Circuit did not find that the Project was within a

wildland-urban interface. It left that issue – with the benefit of the Ninth Circuit's different interpretation of HFRA's definitions – for the district court to resolve on remand. *Id*. at 497 n.7 ("We do not decide whether Nordman or Lamb Creek (or anywhere else) qualify as 'at-risk' communities for purposes of HFRA's categorical exclusion. That question can be addressed on remand under proper legal and statutory standards.").[5]

**D.** **Since *Petrick***

*Petrick* was decided on May 16, 2023. Ten days later, the USFS withdrew its May 28, 2021 Supplemental Decision Memo and indicated that its October 11, 2018 Initial Decision Memo remained in effect. Not. (Dkt. 26). Defendants also stated that Project operations could begin the first week of August 2023. *Id*. Thereafter, consistent with *Petrick's* remand directives and the parties' stipulated briefing schedules, Alliance renewed its Motion for Preliminary Injunction and/or Temporary Restraining Order in *Hanna Flats II*, followed by the parties renewed Cross-Motions for Summary Judgment in *Hanna Flats I*.[6]

Briefing on Plaintiff's renewed Motion for Preliminary Injunction and/or Temporary Restraining Order concluded on July 7, 2023. On July 19, 2023, Judge Winmill held a hearing on Plaintiff's renewed Motion for Preliminary Injunction and/or Temporary Restraining Order in *Hanna Flats II*. No argument took place at that time. Instead, owing to the interplay between *Hanna Flats I* and *Hanna Flats II*, Judge Winmill questioned whether a single judge should oversee both cases. Judge Winmill proposed that, since *Hanna Flats I* was filed first, *Hanna Flats II* should be reassigned to the undersigned. Neither party objected to the handling of both

---

[5] Like Judge Winmill in *Hanna Flats II*, the Ninth Circuit did not address Alliance's Access Amendments-related claim (First Claim for Relief).

[6] Contemporaneous with Judge Bush's June 2021 retirement, *Hanna Flats I* was reassigned to the undersigned. The parties' renewed Cross-Motions for Summary Judgment in *Hanna Flats I* are therefore before the undersigned.

**ORDER - 9**

cases before the undersigned. On July 25, 2023, Judge Winmill entered a "Referral Order" that effectively reassigned *Hanna Flats II* to the undersigned. Referral Order (Dkt. 36). Thereafter, the parties formally consented to the undersigned's jurisdiction.

In the meantime, Project operations were temporarily suspended. But on August 4, 2023, Defendants provided notice that operations on the Thin Lamb Good Neighbor Authority Sale (a timber sale authorized by the Project) could resume on September 18, 2023 beginning with road work. Not. (Dkt. 37).

Briefing on the parties' renewed Cross-Motions for Summary Judgment concluded on August 24, 2023. With all this in mind, the parties' pending motions in *Hanna Flats I* and *Hanna Flats II* – which address *Petrick's* distinct remands (confronting two different judges' rulings) and involve distinct administrative records – are now before an entirely new judge to resolve.

## II. LEGAL STANDARD

In general, the showing required for a temporary restraining order and a preliminary injunction are the same. A plaintiff seeking either "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Alternatively, relief is also appropriate under the "sliding scale" approach: when "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor," combined with a likelihood of irreparable injury and a showing that the order would serve the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks omitted); *see also Nat'l Urban League v. Ross*, 484 F.

ORDER - 10

Supp. 3d 802, 805 (N.D. Cal. 2020) (applying sliding scale approach for temporary restraining order). In this context, "'serious questions' refer to questions that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Petrick*, 68 F.4th at 497 (internal quotation marks and citations omitted).

Although the standard for obtaining a temporary restraining order and a preliminary injunction is identical, they serve fundamentally different purposes. "The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008-09 (D. Or. 2019) (internal quotation marks and citations omitted); *see also Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Servs.*, 462 F. Supp. 3d 990, 996 (D. Ariz. 2020) ("The purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction hearing may be held.").

On that point, "[a] key difference between a temporary restraining order and a preliminary injunction is its respective duration." *Dudley v. Boise State Univ.*, 2022 WL 17551104 at *3 (D. Idaho 2022). Preliminary injunctions remain in force throughout the litigation, whereas provisional temporary restraining orders are traditionally more limited in time – "restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974). So, despite important overlap, issuing a temporary restraining order is not designed to replace the "thorough consideration contemplated by full proceedings pursuant to a preliminary injunction." *Oby v. Clear Recon Corp.*, 2016 WL 3019455 at *1 (E.D. Cal. 2016).

**ORDER - 11**

## III. DISCUSSION

Alliance filed its Motion for Preliminary Injunction and/or Temporary Restraining Order in *Hanna Flats II*. While *Hanna Flats II* originally considered the USFS's Supplemental Decision Memo against HFRA's requirements, the USFS has since withdrawn it and reinstated its Initial Decision Memo (the focus of *Hanna Flats I*). This circumstance informs Defendants' position that Alliance's wildland-urban interface-related claim in *Hanna Flats II* (the Second Claim for Relief) is now moot and cannot supply the basis for any injunctive relief. *See* Opp. to Renewed Mot. for PI at 7-10 (Dkt. 31). If correct, this leaves only Alliance's untested Access Amendments-related claim in *Hanna Flats II* (the First Claim for Relief) to anchor not only the case itself but also Alliance's pursuit of a preliminary injunction to suspend the project until it can be resolved on the merits.

The problem with this approach, however, is that it altogether ignores Alliance's wildland-urban interface-related claims and the Initial Decision Memo's legal shortcomings when it comes to satisfying HFRA's definition of a wildland-urban interface. That is, *Hanna Flats I*, *Hanna Flats II*, and *Petrick* all confirmed that county community plans by themselves – upon which the Initial Decision Memo relies – are not enough to support the USFS's argument in support of a categorical exemption. *Supra*. And the threshold waiver/exhaustion issue attendant to that claim's viability is simultaneously pending before the Court in *Hanna Flats I* via the parties' renewed Cross-Motions for Summary Judgment relating to Alliance's wildland-urban interface-related claims there (the Fourth Claim for Relief).

This unsettled, convoluted, and procedurally-dense setting demands structure and a commonsense approach to handling the cases' many moving parts. Resolving *Hanna Flats I* first will bring into better focus the true contours of Alliance's claim to a preliminary injunction in *Hanna Flats II*. It could either streamline or expand those eventual arguments depending on

**ORDER - 12**

whether or not Alliance's wildland-urban interface-related claims are viable. Conversely, proceeding headlong with *Hanna Flats II* without first resolving *Hanna Flats I* risks allowing the Project to proceed without the benefit of a complete record. All this combines to create unresolved serious questions going to the merits that require "more deliberative investigation" before the Court is able to consider the propriety of a preliminary injunction. The preservation of the status quo in the meantime is, indeed, the archetypal use of a temporary restraining order. *See, e.g.*, *Roe v. Critchfield*, 2023 WL 5146182 at *4 (D. Idaho 2023) (issuing temporary restraining order to "preserv[e] the status quo pending a more complete review").[7]

Regarding the balance of the remaining *Winter* factors, the Court sees no immediate need to depart from Judge Winmill's undisturbed findings in *Hanna Flats II*. There, Judge Winmill first found that Alliance "made the requisite showing that there is a likelihood that irreparable injury will result if this Project is allowed to proceed without an evaluation of the environmental impact of the Project or an adequate explanation of how the Project area qualifies for the categorical exclusion under HFRA." *Hanna Flats II*, 550 F. Supp. 3d at 905. Second, he acknowledged the strong public interests on both sides before concluding that "allowing the potentially environmentally damaging Project to proceed without an adequate showing that the Project falls within HFRA's categorical exclusion from NEPA requirements, or that NEPA requirements have been met, is contrary to the mandate of NEPA, and is contrary to the public interest." *Id*. at 906. Third, in light of the "strong likelihood" of irreparable harm and the public

---

[7] Hand-in-hand with the orderly progression of the cases moving forward is the Court's ability to timely hear them. Due to the Court's calendar limitations – a function of previously scheduled engagements and Court settings, the recent completion of briefing in *Hanna Flats I*, and the relatively recent reassignment of *Hanna Flats II* to the undersigned – the Court is likely unable to "settle the pond" on the circulating issues present in both *Hanna Flats I* and *Hanna Flats II* before September 18, 2023. A short temporary restraining order preserving the status quo pending a decision on Alliance's Motion for Preliminary Injunction accounts for this while ensuring that Alliance does not face irreparable harm in the interim.

ORDER - 13

interest in ensuring that the Project complies with HFRA and NEPA, he found that "the balance of equities tips sharply in favor of Alliance and the issuance of an injunction." *Id*. These findings apply equally in the unique setting now before the Court and similarly exist to support a temporary restraining here.

A temporary restraining order is therefore issued which suspends the Project until *Hanna Flats I* is resolved and a hearing can take place on Alliance's request for a preliminary injunction in *Hanna Flats II*. At that time, if both cases are understood to remain pending, the Court may address the parties' possible interest in consolidating the two cases moving forward to promote judicial efficiency. Until then, the cases exist in their separate spaces, owing to their different procedural histories and *Petrick's* targeted remands for each. At bottom, a temporary restraining order allows for the full and systematic consideration of the two cases' parallel tracks.

## IV. **ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's Renewed Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. 29) is GRANTED, only insofar as a temporary restraining order is issued to preserve the status quo pending the completion of proceedings pursuant to a preliminary injunction. Compared to its lengthy history thus far, the Project is briefly suspended until then. The Court will commit to a swift scheduling of future hearings pertinent to these issues, beginning with a hearing on the parties' renewed Cross-Motions for Summary Judgment in *Hanna Flats I* on October 3, 2023.

DATED: September 6, 2023

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

ORDER - 14