## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | Case No.: 2:21-cv-00244-REP |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 45)** |
| U.S. FOREST SERVICE, *et al*., | |
| Defendants. | **PLAINTIFF'S MOTION TO COMPLETE AND/OR SUPPLEMENT THE ADMINISTRATIVE RECORD AND/OR TAKE JUDICIAL NOTICE (Dkt. 47)** |
| | **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. 51)** |

Pending before the Court are (i) Plaintiff's Motion for Summary Judgment (Dkt. 45), and (ii) Defendants' Cross-Motion for Summary Judgment (Dkt. 51).  Plaintiff also filed a related Motion to Complete and/or Supplement the Administrative Record and/or Take Judicial Notice (Dkt. 47).  The Court held a hearing on the cross-motions for summary judgment on February 25, 2025.  Because the Hanna Flats Good Neighbor Authority Project's implementation will violate the Access Amendment Record of Decision baselines for total and open road mileage in the Priest Bears Outside Recovery Zone area, Plaintiff's Motion for Summary Judgment (Dkt. 45) is largely granted, while Defendants' Cross-Motion for Summary Judgment (Dkt. 51) is largely denied.  Plaintiff's Motion to Complete/Supplement the Administrative Record (Dkt. 47) is also denied.  These rulings are more particularly explained in the following Memorandum Decision and Order.

**MEMORANDUM DECISION AND ORDER - 1**

# I.  BACKGROUND

This case concerns Plaintiff Alliance for the Wild Rockies's ("Alliance") claim that the Hanna Flats Good Neighbor Authority Project ("Project") on the Priest Lake Ranger District of the Idaho Panhandle National Forest ("IPNF") will harm grizzly bears.  Specifically, Alliance claims that Defendant U.S. Forest Service's ("USFS") October 11, 2018 Decision Memo approving the Project violates the 2011 Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones – commonly referred to as the "Access Amendment."  Alliance in turn argues that the Project violates the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA") the Healthy Forest Restoration Act ("HFRA"), and the Administrative Procedure Act ("APA").  Alliance requests that the Court either vacate the Project's Decision Memo or enjoin the Project's implementation until the USFS complies with the law.  For context, the Court includes a brief discussion about the 2011 Access Amendment generally, as well as the Project, before turning to this action's history and Alliance's particular allegations against the USFS.

## A.     The 2011 Access Amendment

The Selkirk grizzly bear is listed as a threatened species under the Endangered Species Act ("ESA").  All.'s SOF No. 11 (Dkt. 46) (citing AR 30601); USFS's Resp. to SOF No. 11 (Dkt. 52-1).  Updated Selkirk grizzly bear monitoring reports identify a minimum population of approximately 50 bears, with increasing human-caused mortality averages in recent years.  All.'s SOF Nos. 12-14 (Dkt. 46) (citing AR 30909; Ex. A at 14 (Dkt. 45-2)); USFS's Resp. to SOF Nos. 12-14 (Dkt. 52-1).  One of the undisputed threats to grizzly bears is roads.  All.'s SOF No. 19 (Dkt. 46) (citing AR 1176-77 (the U.S. Fish and Wildlife Service stating in their 1993 Grizzly Bear Recovery Plan: "Roads probably pose the most imminent threat to grizzly habitat today. The management of roads is one of the most powerful tools available to balance the needs of

people with the needs of bears.  It is strongly recommended that road management be given the

highest priority within all recovery zones.")); USFS's Resp. to SOF No. 19 (Dkt. 52-1); *see also*

AR 1304-07 (discussing impacts of roads on grizzly bears).

The 2011 Access Amendment sought to address this issue.  It amended the then-existing

land and resource management plans (also known as forest plans) within the Selkirk and

Cabinet-Yaak Recovery Zones[1] for the purpose of "include[ing] a set of wheeled motorized

access and security guidelines to meet [the USFS's] responsibilities under the [ESA] to conserve

and contribute to recovery of grizzly bears."  AR 9198.  In particular, the Access Amendment

"remove[d] the existing forest plan standards regarding linear open road density and habitat

effectiveness and *replace[d] those standards with limits on Open Motorized Road Density*

*(OMRD), Total Motorized Road Density (TMRD), and core area*."  *Id*. (emphasis added).

Critically, standards for linear miles of total and open roads also applied to areas outside

recovery zones that experience recurring use by grizzly bears – called "Bears Outside of

Recovery Zones" ("BORZ").  *Id*. ("The intent of this direction is to reduce the potential for

mortality and displacement of grizzly bears from areas of reoccurring use by grizzly bears

outside of but adjacent to the recovery zones.").[2]  At bottom, "[t]he Access Amendment uses

OMRD, TMRD, and core area as surrogates for grizzly bear recovery risk factors."  *Ctr. for*

*Biological Diversity v. U.S. Forest Serv.*, 2021 WL 2295580, at *7 (D. Idaho 2021).

---

[1]  The 1993 Grizzly Bear Recovery Plan established six grizzly bear recovery zones: the Northern Continental Divide Ecosystem, the Greater Yellowstone Area Ecosystem, the Cabinet-Yaak Ecosystem, the Selkirk Ecosystem, the Northern Cascades Ecosystem, and the Bitterroot Ecosystem.  AR 1143, 1190, 1196-1278.  A recovery zone is defined as "the area in each grizzly bear ecosystem within which the population and habitat criteria for achievement of recovery will be measured."  AR 1172.

[2]  The Court understands that "open roads" are roads that are open for motorized use (not restricted), and that "total roads" include open roads, restricted roads, and roads not meeting reclaimed criteria.  *Compare* AR 9203, *with* AR 27751, 27983.

**MEMORANDUM DECISION AND ORDER - 3**

Relevant here, for seven identified BORZ areas located outside of the Selkirk and Cabinet-Yaak Recovery Zones, the Access Amendment prohibits any permanent road increases (for both open and total roads) above the "baseline conditions" identified within the Access Amendment, providing in pertinent part:

> The Forest shall ensure no increases in permanent linear miles of *open road* on National Forest System lands in any individual BORZ, *above the baseline conditions identified in Table [16]*, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares). Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ.
>
> ….
>
> The Forest shall ensure no net permanent increases in linear miles of *total roads* in any individual BORZ area *above the baseline conditions identified in Table 16*, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to ANILCA claims, identification of RS2477 thoroughfares, etc.). Otherwise, potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction or reconstruction of currently bermed or barriered roads.

AR 9255 (emphasis added). The above-referenced "baseline conditions identified in Table 16" are as follows:

Table 16. Habitat conditions for bears outside recovery zone (BORZ) occupancy areas

| BORZ Name | Grizzly Bear Ecosystem | Total Size (Acres) | NFS[1] Lands (Acres) | Total Linear Miles of Roads on NFS Lands | Total Linear Miles of Open Roads on NFS Lands |
|---|---|---|---|---|---|
| Priest | Selkirk | 80,733 | 75,793 | 316.4 | 314.4 |
| Pack River | Selkirk | 33,869 | 28,097 | 41.9 | 37.9 |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 200.3 | 167.3 |
| Clark Fork | Cabinet-Yaak | 101,899 | 100,421 | 256.1 | 176.9 |
| Cabinet Face | Cabinet-Yaak | 28,052 | 27,093 | 164.1 | 128 |
| West Kootenai | Cabinet-Yaak | 173,122 | 169,705 | 615.3 | 315.9 |
| Tobacco | Cabinet-Yaak | 287,240 | 266,947 | 1,123.9 | 867 |

[1] National Forest System lands

AR 9256.

**MEMORANDUM DECISION AND ORDER - 4**

As explained below, the Project lies within the Priest BORZ.  All.'s SOF Nos. 17-18 (Dkt. 46) (citing AR 27313); USFS's Resp. to SOF No. 17-18 (Dkt. 52-1).  Therefore, the Access Amendment baseline condition for total roads in the Priest BORZ is 316.4 miles, and the Access Amendment baseline condition for open roads in the Priest BORZ is 314.4 miles.  All.'s SOF No. 28 (Dkt. 46) (citing AR 9256); USFS's Resp. to SOF No. 28 (Dkt. 52-1).

The IPNF, on which the Project is located, formally adopted the Access Amendment into its Forest Plan in 2015.  AR 11723 (noting that the Access Amendment standard for motor vehicle use within the Selkirk and Cabinet-Yaak Recovery Zones, as well as the Access Amendment standards for linear miles of open and total road for BORZ areas are "retained in this Forest Plan through standard FW-STD-WL-02").  The 2015 IPNF Forest Plan thus mirrors the 2011 Access Amendment regarding motorized use limits within the Priest BORZ.  *Compare* AR 9255-56, *with* AR 11872-73 (replacing Table 16 with Table 26).

## B.    The Project

On October 11, 2018, the USFS issued a Decision Memo (the "Initial Decision Memo") authorizing the Project.  AR 27361-78.  The Project is located in Bonner County, Idaho, on the Priest Lake Ranger District of the IPNF, approximately two miles west of Priest Lake and 25 miles north of the town of Priest River.  AR 14420, 27361.  Though no part of the Project is within a grizzly bear recovery zone, it is immediately adjacent to the Selkirk Recovery Zone to the north and within the Priest BORZ.  AR 27313.

The Project was designed to reduce the risk or extent of insect or disease infestation and reduce the current and future risk of catastrophic wildfire to people, public and private lands, and infrastructure.  AR 14425-26, 27361.  The 6,814-acre Project area is dominated by dense, mixed-conifer forest stands with large amounts of surface, ladder, or canopy fuels.  AR 14420-22.  The Project authorizes various treatments on 2,352 acres, including timber-harvest, prescribed fire,

**MEMORANDUM DECISION AND ORDER - 5**

and reforestation.  AR 14445-48, 27362-63.  It also authorizes temporary road construction,

excavated skid trail construction, and road maintenance.  AR 14448-49, 27363-64, 27389.  A

map of the Project shows:



Figure 1. Vicinity map of the Hanna Flats Good Neighbor Authority project area

AR  14421, 27379.

**MEMORANDUM DECISION AND ORDER - 6**

Notably, the USFS issued the Initial Decision Memo under Section 603 of HFRA, which exempts qualifying insect and disease projects in wildland-urban interfaces from NEPA's requirements. AR 27365-69 (analyzing the Project's compliance with HFRA's categorical exclusion). As a result, no environmental assessment or environmental impact statement was ever issued for the Project. The USFS estimates that the Project will likely take 5-10 years to implement. AR 27365.

## C.    The Procedural History

1.    *Hanna Flats I* and the USFS's 2018 Initial Decision Memo

Alliance challenged the Initial Decision Memo in an earlier proceeding before then-Chief U.S. Magistrate Judge Ronald E. Bush: *Hanna Flats I* (Case No. 2:19-cv-00332). There, Alliance argued that, in approving the Project, the USFS (i) violated the Access Amendment; and (ii) failed to establish that the Project meets the statutory definition of a wildland-urban interface and, likewise, failed to establish that the Project qualifies for a categorical exclusion under HFRA. On the parties' cross-motions for summary judgment, Judge Bush preliminary concluded that Alliance's Access Amendment-related claims could not be resolved as a matter of law, owing to the constantly-evolving record relating to the subsequent reinitiation and conclusion of ESA Section 7 consultations. *All. for the Wild Rockies v. Higgins (Hanna Flats I)*, 535 F. Supp. 3d 957, 963 n.5 (D. Idaho 2021). He then denied both motions for summary judgment, without prejudice, as to Alliance's Access Amendment-related claims. *Id*. at 963-64.[3]

So, *Hanna Flats I* substantively addressed only Alliance's wildland-urban interface-related claims. The USFS took the position that, because the Project area had been designated as

---

[3] Judge Bush allowed Alliance to file a separate action if necessary, based on a more developed and up-to-date record following remand. *Hanna Flats I*, 535 F. Supp. 3d at 963-64 n.6. In doing so, he observed that Alliance's wildland-urban interface-related claims remained subject to the pending cross-motions for summary judgment. *Id*.

**MEMORANDUM DECISION AND ORDER - 7**

a wildland-urban interface in the Bonner County Wildfire Protection Plans, the Project met the definition of a wildland-urban interface under HFRA and the Project was therefore categorically excluded from NEPA analysis. Alliance disagreed, claiming that, while there is a categorical exclusion for wildland-urban interfaces, the USFS did not sufficiently prove that to be the case vis à vis the Project area.

Judge Bush ultimately agreed with Alliance and granted its motion for summary judgment in this respect. He found that the USFS violated HFRA because it failed to use HFRA's statutory definition of wildland-urban interface and therefore could not claim that the Project was categorically excluded from NEPA compliance. *Id*. at 977-79. Judge Bush then remanded the action to the USFS to revisit its claim that the entire Project is within a wildland-urban interface. *Id*. at 980. He required the USFS to issue a Supplemental Decision Memo that clearly explained how the Project area falls within the wildland-urban interface under HFRA. *Id*. at 980-81. In the meantime, Judge Bush suspended the Project. *Id*.

> 2.    *Hanna Flats II* and the USFS's 2021 Supplemental Decision Memo

In response to Judge Bush's direction, the USFS issued a Supplemental Decision Memo on May 28, 2021. Then, on June 1, 2021, the USFS informed Alliance that it had complied with Judge Bush's remand order in *Hanna Flats I* and that it planned to begin logging under the Project as soon as July 2, 2021.

Alliance challenged the Supplemental Decision Memo in a subsequent action (this case) before U.S. District Judge B. Lynn Winmill: *Hanna Flats II* (Case No. 2:21-cv-00244). Alliance argued that the Project remained unlawful under both the Initial Decision Memo and, also, under the updated Supplemental Decision Memo. It alleged that (i) the USFS still failed to demonstrate compliance with the Access Amendment; and (ii) the Supplemental Decision Memo did not comply with Judge Bush's remand order in *Hanna Flats I* and still failed to meet the

**MEMORANDUM DECISION AND ORDER - 8**

statutory definition of wildland-urban interface regardless.  The next day, Alliance moved for a preliminary injunction, seeking to maintain the status quo until Judge Winmill could issue a final decision on the merits of the case.

Judge Winmill granted Alliance's motion.  Aided by the *Winter* factors, he concluded that there were "serious questions going to the merits."  *All. for the Wild Rockies, v. Pierson (Hanna Flats II)*, 550 F. Supp. 3d 894, 898-904 (D. Idaho 2021).  He observed that the Supplemental Decision Memo did not analyze how the Project satisfied HFRA's definition of wildland-urban interface, improperly relying instead on (i) Bonner County's Community Wildfire Protection Plan that simply said so, and (ii) Bonner County's 2017 Hazard Mitigation Plan that did not discuss or analyze the Project using HFRA's definitions.  *Id.*  Further, he noted that the Supplemental Decision Memo failed to apply the proper definition of "at-risk communities" and "within or adjacent to" (component parts of the definition of a wildland-urban interface).  *Id.*  Accordingly, Judge Winmill found that the balance of equities tipped sharply in Alliance's favor and issued a preliminary injunction.  *Id*. at 905-07.[4]  The Project was once again suspended until further notice.  *Id*. at 907.

3.    The Ninth Circuit and *Petrick*

The USFS appealed both the summary judgment decision in *Hanna Flats I* and the preliminary injunction in *Hanna Flats II*.  In a single opinion, the Ninth Circuit addressed both appeals.  *See Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475 (9th Cir. 2023).

a.    *Hanna Flats I on Appeal*

The only issue resolved on appeal in *Hanna Flats I* was whether Alliance's comments during the Project's scoping phase put the USFS on notice of Alliance's wildland-urban interface

---

[4]  Like Judge Bush in *Hanna Flats I*, Judge Winmill did not address Alliance's Access Amendment-related claim.

**MEMORANDUM DECISION AND ORDER - 9**

concerns.  The Ninth Circuit held that they did not, vacated the grant of summary judgment, and remanded for the district court to consider in the first instance whether any such comments were necessary to challenge a project exempted from NEPA analysis by a categorical exclusion, and if so, whether such arguments were ever waived.  *Id*. at 489-90.

        b.     *Hanna Flats II on Appeal*

Among the issues on appeal in *Hanna Flats II*, the USFS argued that its Initial Decision Memo and Supplemental Decision Memo offered a sufficient explanation for the use of the categorical exclusion simply by noting that the Project is within the wildland-urban interface identified by the Bonner County community plan.  The Ninth Circuit disagreed because that plan's definition of "wildland-urban interface" was broader than HFRA's definition, "likely result[ing] in a covered area beyond what Congress authorized."  *Id*. at 494.  Accordingly, the Ninth Circuit concluded that the Bonner County community plan's asserted wildland-urban interface would not support the use of HFRA's categorical exclusion.  *Id*.

Notwithstanding, the Ninth Circuit vacated the preliminary injunction issued by Judge Winmill.  *Id*. at 496-98.  It held that the grant of preliminary injunction rested on a faulty interpretation of wildland-urban interface that was "belied by HFRA's statutory language."  *Id*. at 495.  As a result, the Ninth Circuit remanded to the district court to apply the proper legal and statutory standards.  *Id*. at 497 n.7.[5]

        4.     <u>Since *Petrick*</u>

*Petrick* was decided on May 16, 2023.  Ten days later, the USFS withdrew its May 28, 2021 Supplemental Decision Memo and indicated that its October 11, 2018 Initial Decision Memo remained in effect.  Not. (Dkt. 26).  The USFS also stated that Project operations could

---

[5]  Like Judge Winmill in *Hanna Flats II*, the Ninth Circuit did not address Alliance's Access Amendment-related claim.  *Petrick*, 68 F.4th at 498.

**MEMORANDUM DECISION AND ORDER - 10**

begin the first week of August 2023.  *Id.*  Thereafter, consistent with *Petrick's* remand directives and the parties' stipulated briefing schedules, Alliance renewed its motion for preliminary injunction in *Hanna Flats II*, followed by the parties renewed cross-motions for summary judgment in *Hanna Flats I* – both addressing the issues remanded from the Ninth Circuit.[6]

Briefing on Alliance's renewed motion for preliminary injunction in *Hanna Flats II* concluded on July 7, 2023.  On July 19, 2023, Judge Winmill held a hearing on the motion, but did not hear substantive argument.  Instead, owing to the possible interplay between *Hanna Flats I* and *Hanna Flats II*, Judge Winmill questioned whether a single judge should oversee both cases and, since *Hanna Flats I* was filed first, whether *Hanna Flats II* should be reassigned to the undersigned.  Neither party objected to the consolidation of both cases before the same judge and, on July 25, 2023, Judge Winmill entered a "Referral Order" that effectively reassigned *Hanna Flats II* to the undersigned.  Referral Order (Dkt. 36).  The parties later consented to the undersigned's jurisdiction.

In the meantime, Project operations were temporarily suspended.  But on August 4, 2023, the USFS provided notice that operations on the Thin Lamb Good Neighbor Authority Sale (a timber sale authorized by the Project) were back on again and could start on September 18, 2023, beginning with road work.  Not. (Dkt. 37).

Briefing on the parties' renewed cross-motions for summary judgment in *Hanna Flats I* concluded on August 24, 2023.  Addressing the two cases' parallel tracks and distinct remands, on September 6, 2023, the Court entered a temporary restraining order in *Hanna Flats II* that suspended the Project until *Hanna Flats I* was resolved and Alliance's renewed motion for preliminary injunction in *Hanna Flats II* could be heard.  Order (Dkt. 41).

---

[6]  Contemporaneous with Judge Bush's retirement, *Hanna Flats I* was reassigned to the undersigned in June 2021.

**MEMORANDUM DECISION AND ORDER - 11**

On October 3, 2023, the Court held a hearing on the parties' renewed cross-motions for summary judgment in *Hanna Flats I*.  On January 10, 2024, the Court resolved the remanded claim in *Hanna Flats I* in the USFS's favor, concluding that Alliance waived its challenge to the USFS's use of a categorical exclusion.  *All. for the Wild Rockies v. Higgins*, 2024 WL 113552, at *10 (D. Idaho 2024).  Alliance appealed that ruling on March 10, 2024.

In February 2024, the parties jointly agreed to convert their preliminary injunction-related briefing in *Hanna Flats II* into cross-motions for summary judgment, with the USFS also agreeing to allow the injunction in *Hanna Flats II* to remain in place until those motions are resolved.  Jnt. Status Report (Dkt. 42); Order (Dkt. 43).  The at-issue cross-motions for summary judgment (Dkts. 45 & 51) are the product of that agreement.  On February 25, 2025, the Court held a hearing on the cross-motions for summary judgment in *Hanna Flats II*.  This Memorandum Decision and Order addresses the arguments raised therein.

### D.    This Action

At more-or-less a standstill since June 2021, Alliance's Complaint raises two familiar claims for relief.  First, it argues that the Project does not comply with the Access Amendment in violation of NFMA, HFRA, NEPA, and the APA because it results in a net increase from the Access Amendment's baseline conditions for both total and open roads.  Compl. at ¶¶ 131-153 (Dkt. 1).  Despite the lengthy and often overlapping procedural history to both *Hanna Flats I* and *Hanna Flats II*, this claim has never been addressed by either this Court or the Ninth Circuit.  Second, Alliance argues that the USFS failed to establish that the Project is within a wildland-urban interface under HFRA.  *Id*. at ¶¶ 154-175.[7]

---

[7]  Alliance attempts to apply this claim to both the since-withdrawn Supplemental Decision Memo, as well as the Initial Decision Memo. All.'s Mem. ISO MSJ at 18 (Dkt. 45-1) ("*Hanna Flats II* raises wildland-urban interface claims against both the Supplemental Decision Memo, Dkt. 1 ¶¶ 173-175, and the [Initial] Decision Memo, Dkt. 1 ¶¶ 154-172.").  That is, since

Distilled down, then, the lynchpin question before the Court is whether the Project violates the Access Amendment. Alliance claims that it does, pointing to the fact that the Project undisputably results in mileage exceeding the Access Amendment's baseline conditions. All.'s Mem. ISO MSJ at 4-11 (Dkt. 45-1). Alliance also contends that an additional 30.4 miles of illegal roads in the Priest BORZ were not included in the USFS's open roads and total roads calculations for the Project, further highlighting the USFS's noncompliance with the Access Amendment. *Id*. at 11-15.

The USFS counters that the Project is fundamentally consistent with the Access Amendment because it results in reduced road mileage in the Priest BORZ. USFS's Mem. ISO of MSJ at 6-7 (Dkt. 51-1). The USFS additionally argues that the Project's road mileage does not violate the Access Amendment because an "administrative change" in 2021 "corrected" the Priest BORZ road mileage baselines in the IPNF Forest Plan. *Id*. The Project, according to the USFS, further complies with these corrected baseline figures since it has effectively prevented the unauthorized use of the additional 30.4 miles of illegal roads in the Priest BORZ. *Id*. at 7-14.

## II. <u>STATUTORY BACKGROUND</u>

### A.    **The National Forest Management Act ("NFMA")**

NFMA requires that each National Forest develop a land and resource management plan, i.e., a forest plan. 16 U.S.C. § 1604(a). All site-specific projects must be consistent with the

---

Alliance initiated *Hanna Flats II* (on June 7, 2021) before the USFS withdrew its Supplemental Decision Memo (on May 26, 2023), Alliance's more recent briefing attempts to account for this temporal oddity by arguing after-the-fact within its summary judgment briefing that the now-revived Initial Decision Memo (dated October 11, 2018) cannot demonstrate compliance with the statutory wildland-urban interface definition under HFRA, given this Court's and the Ninth Circuit's consideration of that issue. *Id*. at 16-20. The USFS responds that Alliance's HFRA challenge is moot and/or waived in light of the *Hanna Flats I* proceedings (now on appeal). USFS's Mem. ISO MSJ at 14-18 (Dkt. 51-1). The Count tends to agree with the USFS on this discrete point, but ultimately need not resolve the issue as a matter of law given its consideration of Alliance's underlying road mileage challenge.

**MEMORANDUM DECISION AND ORDER - 13**

governing forest plan.  16 U.S.C. § 1604(i).  "It is well-settled that the [USFS's] failure to

comply with the provisions of a forest plan is a violation of NFMA."  *Native Ecosystems Council*

*v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) (citing *Neighbors of Cuddy Mountain v.*

*Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002) ("Specific projects, such as the Grade/Dukes

timber sale, must be analyzed by the [USFS] and the analysis must show that each project is

consistent with the plan."); *Neighbors v. Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372,

1377-78 (9th Cir. 1998) (holding that the USFS was not in compliance with NFMA where its

site-specific project was inconsistent with the forest plan of the entire forest); *Friends of*

*Southeast's Future v. Morrison*, 153 F.3d 1059, 1068 n.4 (9th Cir. 1998) ("16 U.S.C. § 1604(i)

plainly imposes a legal obligation on the [USFS] to ensure that timber sales are consistent with

the relevant forest plan.")).  The 2015 IPNF Forest Plan incorporated the 2011 Access

Amendment (*see supra*); therefore, here, the relevant IPNF Forest Plan provision is the Access

Amendment.

**B.      The National Environmental Policy Act ("NEPA")**

NEPA is a pragmatic legislation that "'does not mandate particular results,' but 'simply

provides the necessary process' to ensure that federal agencies take a 'hard look' at the

environmental consequences of their actions."  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*,

177 F.3d 800, 814 (9th Cir. 1999) (quoting *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 350-51 (1989) (further stating that NEPA "prohibits uninformed – rather than unwise –

agency action").  NEPA requires that agencies prepare an environmental impact statement for

any proposed agency action "significantly affecting the quality of the human environment."  42

U.S.C. § 4332(C); 40 C.F.R. § 1508.11.  NEPA does not apply to actions Congress has explicitly

exempted from the statute's requirements.  36 C.F.R. § 220.4(a)(4); *Ctr. for Biological Diversity*

*v. Ilano*, 928 F.3d 774, 780-81 (9th Cir. 2019).

**MEMORANDUM DECISION AND ORDER - 14**

C.    **The Healthy Forests Restoration Act ("HFRA")**

The HFRA "directs the [USFS] to take action to 'reduce wildfire risk' and 'enhance efforts to protect watersheds and address threats to forest and rangeland health.'" *WildWest Inst. v. Bull*, 547 F.3d 1162, 1165 (9th Cir. 2008) (quoting 16 U.S.C. § 6501(1), (3)). "Specifically, the [USFS] is required 'as soon as practicable' to implement an 'authorized hazardous fuel reduction project' on federal land where 'the existence of an epidemic of disease or insects, or the presence of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a significant threat to an ecosystem component, or forest or rangeland resource.'" *Id.* (quoting 16 U.S.C. § 6512(a)(4)). Projects that are designed to address these issues may be excluded from NEPA requirements if they meet specific criteria. 16 U.S.C. §§ 6591b(a)(1), 6591a(d). However, projects must be consistent with the governing forest plan. 16 U.S.C. § 6591b(e) ("All projects and activities carried out under this section shall be consistent with the land and resource management plan established under section 1604 of this title for the unit of the National Forest System containing the projects and activities.").

## III.  STANDARD OF REVIEW

An agency's compliance with statutory mandates (e.g., NFMA, NEPA, and HFRA) is reviewed under the Administrative Procedures Act ("APA"). *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990) (stating that judicial review of agency action proceeds under the APA where the statute at issue does not provide a cause of action). Under the APA, an agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, … in excess of statutory jurisdiction, … [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (C), (D). Such a review is narrow and a court may not substitute its judgment for that of the agency. *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1033 (9th Cir. 2020). Neither should a court just "rubber-

**MEMORANDUM DECISION AND ORDER - 15**

stamp" administrative decisions. *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Servs.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

"A [decision] is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996). Finally, an agency must clearly set forth the grounds on which it acted. *Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973).

Summary judgment is typically appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in a case involving review of a final agency action under the APA, the court's role is limited to reviewing the administrative record, and the standard set forth in Rule 56 does not apply. *See Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 200 (D.D.C. 2012) (citing *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117 (D.D.C. 2009), rev'd on other grounds, 617 F.3d 490 (D.C. Cir. 2010)). Rather, under the APA, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (citation omitted); *see also Occidental Eng'g Co. v. Immigration &*

**MEMORANDUM DECISION AND ORDER - 16**

*Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).  Summary judgment is then the mechanism for deciding whether, as a matter of law, the agency action passes muster under the APA.  *See N.w. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994); *Occidental Eng'g*, 753 F.2d at 769-70.

## IV.  <u>DISCUSSION</u>

In support of its claim that the Project violates the Access Amendment, Alliance makes three interrelated arguments: (i) the Project exceeds the Access Amendment mileage baseline conditions for both total and open roads; (ii) an additional 30.4 miles of illegal roads in the Priest BORZ cannot be categorized as permissible "temporary" roads under the Access Amendment because they are not "effectively gated"; and (iii) those additional 30.4 miles of illegal roads are not included in the Project's road density calculations, further exacerbating the USFS's Access Amendment violations.  All.'s Mem. ISO MSJ at 4-15 (Dkt. 45-1).

The USFS dismisses each of these arguments.  It begins by pointing out how the Project complies with the Access Amendment because it reduces total and open roads in the Priest BORZ by 1.2 miles.  USFS's Mem. ISO MSJ at 6-7 (Dkt. 51-1).  It alternatively argues that a 2021 administrative change corrected the road mileage baselines in the IPNF Forest Plan and that the Project aligns with these updated baseline figures.  *Id*. at 7-9.  It lastly argues that it never categorized the questioned 30.4 miles as temporary roads, but has instead closed those illegal roads, with voluntary monitoring ensuring that those closures have effectively prevented unauthorized use over time.  *Id*. at 9-14.

These competing positions frame the issues before the Court.  For the reasons discussed below, the Court concludes that the Project exceeds the Access Amendment mileage baseline conditions for both total and open roads, and that the mileage baseline conditions identified in the Access Amendment and IPNF Forest Plan were not amended via the USFS's 2021

**MEMORANDUM DECISION AND ORDER - 17**

administrative change.  Given these conclusions, the Court need not address whether the additional 30.4 miles of illegal roads were sufficiently closed.

A.      **The Project Exceeds the Access Amendment's Baseline Conditions**

For the Priest BORZ, the Access Amendment set the following baseline conditions: (i) 316.4 miles of total roads; and (ii) 314.4 miles of open roads.  *Supra* (citing AR 9256).  From the time these baselines were established in 2011, however, the existing conditions for both total and open roads have increased and exceeded the baselines, as Alliance illustrates in the following table:

| Monitoring Report Year | Total Roads *Record of Decision Baseline* | Total Roads *Existing Condition* | Open Roads *Record of Decision Baseline* | Open Roads *Existing Condition* |
|---|---|---|---|---|
| 2011 | 316.4 | 316.4 | 314.4 | 314.4 |
| 2012 | 316.4 | 319.0 | 314.4 | 317.0 |
| 2013 | 316.4 | 319.0 | 314.4 | 317.0 |
| 2014 | 316.4 | 319.0 | 314.4 | 317.0 |
| 2015 | 316.4 | 319.2 | 314.4 | 317.2 |
| 2016 | 316.4 | 325.7 | 314.4 | 317.2 |
| 2017 | 316.4 | 325.7 | 314.4 | 317.2 |
| 2018 | 316.4 | 325.0 | 314.4 | 317.2 |
| 2019 | 316.4 | 319.2 | 314.4 | 317.2 |
| 2020 | 316.4 | 340.0 | 314.4 | 337.4 |
| 2021 | 316.4 | 340.0 | 314.4 | 337.4 |
| 2022 | 316.4 | 340.0 | 314.4 | 337.4 |

All.'s Mem. ISO MSJ at 9 (Dkt. 45-1) (citing AR 30746, 30815, 30759, 30772, 30787, 30800, 30826, 30839, 30201, 33248, 33312, 33348).[8]  These figures, says Alliance, show that, "in 11 of

_____

[8]  The USFS does not dispute these figures, except to add how the 2011 baseline conditions later changed via its 2021 administrative change.  USFS's Resp. to SOF No. 29 (Dkt. 52-1) (citing AR 32189-90).

**MEMORANDUM DECISION AND ORDER - 18**

the past 12 years (shaded gray), the Priest BORZ has violated the Access Amendment Record of

Decision baseline for total roads, and violated the Access Amendment Record of Decision

baseline for open roads." *Id*.  Alliance then explains how the post-Project conditions do not

change this fact, stating:

> Regarding authorized open roads, the existing condition is 337.4 miles, and the
> post-Project condition will be 336.2 miles.  Regarding authorized total roads, the
> existing condition is 340.0 miles, and the post-Project condition will be 338.8 miles.
> Both numbers – for both categories of roads – violate the Access Amendment
> Record of Decision baselines, which are 316.4 miles for total roads, and 314.4 miles
> for open roads.

*Id*. at 9-10 (citing AR 32140, 9256).  Alliance's argument that the Project exceeds the Access

Amendment's baseline conditions is therefore straightforward: (i) the Access Amendment

precludes projects that exceed the Access Amendment's baseline conditions; (ii) the total and

open road mileage in the Priest BORZ has violated – and continues to violate – the Access

Amendment's baseline conditions; and (iii) the post-Project mileage conditions do not change

this fact, when comparing its mileage (338.8 miles of total roads and 336.2 miles of open roads)

against the Access Amendment's baseline conditions (316.4 miles of total roads and 314.4 miles

of open roads).

Setting aside for a moment the USFS's argument that its 2021 administrative change

corrected the Access Amendment's baseline condition figures (*infra*), the USFS responds that

Alliance is missing the point: the Project actually reduces total and open roads in the Priest

BORZ by 1.2 miles over existing conditions.[9]  USFS's Mem. ISO MSJ at 6-7 (Dkt. 51-1).  Since

there are no increases in total and open road mileage after the Project, says the USFS, there can

be no Access Amendment/IPNF Forest Plan violation as a threshold matter.  *Id*. at 7 ("Thus,

---

[9]  Though disputing this point at oral argument, in multiple instances, Alliance appears to
acknowledge that the Project will result in fewer total and open roads.  *See, e.g.*, Compl. at ¶ 141
(Dkt. 1); All.'s Mem. ISO MSJ at 9-10 (Dkt. 45-1); All.'s SOF No. 43 (Dkt. 46).

**MEMORANDUM DECISION AND ORDER - 19**

even if the BORZ currently exceeded the 2011 baseline (which it does not), it would only underscore that this mileage-reducing Project is consistent with the Forest Plan and should proceed."); *id.* at 7-8 ("Though the Project complies with the road standard in any event by reducing miles ...."); USFS's Reply ISO MSJ at 3 (Dkt. 57) ("[W]ithout the Project, road mileage in the Priest BORZ will remain 1.2 miles greater than if the Project is implemented. This fact alone is fatal to Plaintiff's claim that the Project is inconsistent with the Forest Plan and NFMA.").

The Court is skeptical of the USFS's reasoning. Nothing in the Access Amendment makes the distinction that the USFS attempts to read into its mandate. That is, whereas the USFS asks that a comparison be made between existing and post-Project conditions, the Access Amendment clearly contemplates "no increases" or "no net permanent increases" in the Priest BORZ "above the baseline conditions." *Supra* (citing AR 9255, 11872). When considering the point of the Access Amendment – to implement road density standards and motorized use limits for the benefit of grizzly bear populations (*supra* (citing AR 9198)) – a project's assessment against existing conditions rather than the Access Amendment's baseline conditions is a false comparison. Projects are to be analyzed alongside the Access Amendment's baseline conditions. Otherwise, projects with mileage that plainly exceeds the Access Amendment's baseline conditions would be permitted on account of a BORZ area already impermissibly exceeding the Access Amendment's baseline conditions; in effect, ignoring – if not rewarding – incremental Access Amendment violations over time.

The USFS casts this view as "illogical" when the Project does not contribute to any violation, citing *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005). USFS's Mem. ISO MSJ at 7 (Dkt. 51-1). In *Lands Council*, the plaintiffs challenged the timber harvest approved by the USFS as part of a watershed restoration project in the IPNF, claiming that the project

**MEMORANDUM DECISION AND ORDER - 20**

violated NFMA because it did not allow the USFS to reach the ten percent old growth forest minimum requirement contained in the IPNF Forest Plan. *Id*. at 1035. Except no old growth forest was to be harvested under the project's selected alternative. *Id*. at 1036. Because the project therefore could not have contributed to any eventual failure to meet the IPNF Forest Plan old growth requirements, the Ninth Circuit rejected the plaintiffs' argument that the project itself was impermissible, stating:

> However, because no old growth forest is to be harvested under the selected alternative, we reject the contention that the Project will be impermissible if, thereafter, the "allocated old growth" within the Forest is less than the Forest Plan requirement. If that requirement would not be met after this Project, then it must be that the requirement is not met now, for the proposed timber harvest cut no old growth. *If we were to accept the Lands Council's argument on this score, it would prevent any project from taking place. We do not think this is a sensible reading of the NFMA. Because no old growth forest is to be harvested under the Project, we hold that it cannot be said that the Project itself violates the IPNF Plan's requirement to maintain ten percent of the forest acreage as old growth forest.*

*Id*. (emphasis added). The USFS analogizes the plaintiffs' claims in *Lands Council* to Alliance's claims here. It argues that, like *Lands Council*, the Project cannot violate the Access Amendment, the IPNF Forest Plan, and NFMA because it does not add road mileage to the Priest BORZ.

*Lands Council* certainly supports the USFS's position on this point and, significantly, Alliance makes no attempt to distinguish it or separately argue against its application. Even so, for several reasons, *Lands Council* does not compel the Court to reject Alliance's claim and grant the USFS the relief it seeks. First, the post-Project mileage exceeds the 2018 mileage conditions in the Priest BORZ (when the Project was first authorized). *See supra* (table indicating 325 miles of total roads and 317.2 miles of open roads for 2018). Second, *Lands Council* dealt with the IPNF Forest Plan; it did not consider the deliberative process surrounding the Access Amendment, nor the Access Amendment's unequivocal mandate about future projects'

**MEMORANDUM DECISION AND ORDER - 21**

compliance with the stated baseline conditions.  Third, unlike *Lands Council* where the project did not impact old growth, here, it cannot be said that the Project does not impact road conditions in the Priest BORZ.  Fourth, and most importantly, *Lands Council* preceded a subsequent Ninth Circuit decision that more closely tracks this action's several moving parts: *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025 (9th Cir. 2018).  Alliance unsurprisingly cites *Savage* in support of its claim that the Project results in total and open road mileage increases over the Access Amendment's baseline conditions, and thus, violates the Access Amendment.  All.'s Reply ISO MSJ at 1-2 (Dkt. 53).

In *Savage*, the plaintiff alleged that a proposed forest management project involving logging, thinning, and road construction and maintenance violated NFMA because its road mileage violated the Kootenai National Forest Plan and the Access Amendment's baseline conditions for the Tobacco BORZ.  *Savage*, 897 F.3d at 1028-30.  The plaintiff objected to the USFS's comparison of the existing conditions to the post-Project conditions, rather than the comparison of the Access Amendment's baseline conditions to the post-Project conditions.  *Id.* at 1032-35.  The Ninth Circuit agreed, stating:

> In an attempt to satisfy the Access Amendments' mandate that road mileage shall not increase beyond the baseline, the Forest Service conducted a survey of existing roads, including "undetermined" roads, in the overlapping area.  It then concluded that because the Project would not increase the road mileage in the overlapping area beyond the existing condition, it would not increase the linear road mileage within the Tobacco BORZ polygon.
>
> In particular, the Forest Service concluded that its construction of 2.2 miles of new road would be more than off-set by decommissioning 0.65 miles of National Forest road and 1.84 miles of "undetermined" road, and that the assignment of road numbers to 2.6 miles of "undetermined" road would have no effect because those roads were already existing.  Based on these calculations, the Forest Service concluded that the net effect of the Project would be a reduction of 0.3 miles of road in the Tobacco BORZ polygon (2.2 - 0.65 - 1.84 = -0.3).  The [U.S. Fish and Wildlife Service] concurred in the Forest Service's conclusion.

**MEMORANDUM DECISION AND ORDER - 22**

E.

> *The Forest Service's analysis was plainly insufficient. The Access Amendments are unequivocal: the Forest Service must examine whether a proposed project will result in road mileage within the BORZ polygon that exceeds the Access Amendments baseline established for that BORZ polygon. The Forest Service did not conduct that analysis.* It instead conducted a survey of the roads existing in the overlapping area at the time of the Project proposal (in 2011), and analyzed the effects of the Project on its own measurement. The Forest Service never assessed the impact of the Project on the 1,123.9 linear mile baseline condition of the Tobacco BORZ polygon. In other words, the Forest Service's "failure to measure [linear road miles] as defined by the [Access Amendments] renders us unable to determine from the record that the agency is complying with the forest plan standard." *Hapner v. Tidwell*, 621 F.3d 1239, 1250 (9th Cir. 2010) (internal quotation marks omitted).

> We recognize that, in some circumstances, it would be possible for the Forest Service to comply with the Access Amendments by measuring the impact of the project on existing roads – but only if the Forest Service additionally determined that the existing roads were included in the Access Amendments baseline measurement. Here, the Forest Service did not determine whether the existing roads it measured (most notably, whether the particular "undetermined" roads it measured), were included in the baseline. Absent such a determination, it is impossible to determine whether the Project will result in an increase in road mileage.

*Id.* at 1035-36 (emphasis added). In the end, *Savage* emphasizes the importance of comparing post-project conditions to the Access Amendment's baseline conditions, not existing conditions. Alliance argues that, "[w]hen this legally-binding rule is followed, the post-Project condition of authorized roads is an unlawful 22.4 mile [of total roads]/21.8 mile [of open roads] net increase from the Access Amendment baseline." All.'s Reply ISO MSJ at 2 (Dkt. 53) (citing *Savage*, 897 F.3d at 1035-36; AR 32140).

The USFS attempts to distinguish *Savage* by commenting how *Savage* does not hold that the Access Amendment's baseline conditions "cannot be corrected if later found to be inaccurate," before pivoting to its next argument that it "properly corrected the [IPNF] Forest Plan baseline mileage figures." USFS's Reply ISO MSJ at 3 (Dkt. 57). It is true that *Savage* did not confront this circumstance, but that is beside the immediate point. By arguing that it

**MEMORANDUM DECISION AND ORDER - 23**

corrected the baseline mileage figures, and that the Project aligns with those corrected figures, the USFS implicitly acknowledges *Savage's* direction: that a project's compliance with the Access Amendment turns on whether the project results in road mileage increases above the Access Amendment's baseline conditions, independent of the existing road mileage conditions. *Savage* thus undercuts *Lands Council*. When viewed this way, the Project violates the Access Amendment because it exceeds the Access Amendment's baseline conditions, *so long as* those baseline conditions were never corrected in the IPNF Forest Plan. Ultimately, the fact that the Project might reduce road mileage conditions as compared to existing conditions does not change the analysis.

The eventual success of the parties' respective arguments therefore depends on whether the USFS properly corrected the IPNF Forest Plan's baseline mileage figures through an administrative change. The Court turns to that question next.

**B.    The USFS Did Not Properly Change the IPNF Forest Plan Baseline Mileage Figures**

Though the Project exceeds the Access Amendment's baseline conditions (*see supra*), if those baseline conditions subsequently were amended, the analysis changes. That is what the USFS says happened in 2021 when it claims to have formally corrected the baseline mileage figures in the IPNF with an "administrative change." USFS's Mem. ISO MSJ at 8-9 (Dkt. 51-1) ("Plaintiff's generalized allegation of inconsistency with the baseline are an illusion created by comparing uncorrected baseline mileage numbers with corrected post-Project road mileage numbers.").

According to the USFS, in 2019 (after Alliance initiated *Hanna Flats I* and, therein, asserted Access Amendment violations), the IPNF reinitiated ESA consultation on its Forest Plan to ensure the Forest Plan's motorized use standards were aligned with the operative Biological Opinion ("BiOp") for the Forest Plan. *Id*. at 8. That process resulted in changes to the 2011

**MEMORANDUM DECISION AND ORDER - 24**

baseline conditions of open and total routes in the related BORZ areas, "due to identification of pre-existing roads, technological improvements in road mapping, and acknowledgment that previously uncounted motorized trails that existed in 2011 were erroneously excluded from the baseline."  *Id.* (citing AR 31991-92) (reporting these alleged pre-existing miles of road as "database corrections" which "should have been included in the baseline condition of BORZ at the time the Access Amendment was implemented").  Those purported corrections resulted in the following increased baseline mileage figures:

| Bears Outside Recovery Zone | Grizzly Bear Recovery Zone | Total Size (Acres) | National Forest System Lands | | |
|---|---|---|---|---|---|
| | | | Total Area (Acres) | Total Routes (Miles) | Open Routes (Miles) |
| **Priest Lake** | Selkirk | 80,733 | 75,793 | **340.0** | **337.4** |
| Pack River | Selkirk | 33,869 | 28,097 | 48.6 | 46.7 |
| Pack River II | Selkirk | 2,144 | 2,650 | 14.2 | 11.3 |
| **Pack River Combined** | Selkirk | 36,013 | 30,747 | **63.7** | **58.0** |
| Mission-Moyie | Cabinet-Yaak | 71,545 | 58,472 | 239.9 | 209.9 |
| Mission-Moyie II | Cabinet-Yaak | 29,343 | 28,703 | 102.2 | 100.2 |
| Mission-Moyie III | Cabinet-Yaak | 6,629 | 3,631 | 25.6 | 25.2 |
| **Mission-Moyie Combined** | Cabinet-Yaak | 107,517 | 90,806 | **367.7** | **335.3** |

AR 31992 (listed as Table 5), 32026 (listed as Table 10 with same information but reflecting only Priest, Pack River Combined, and Mission-Moyie Combined BORZ areas).  For the Priest BORZ, then, the baseline condition for total roads became 340.0 miles (compared to 316.4 miles in the Access Amendment), and the baseline condition for open roads became 337.4 miles (compared to 314.4 miles in the Access Amendment).

To consider potential effects on grizzly bears in light of the new BiOp, the USFS reinitiated ESA consultation on the Project.  USFS' Mem. ISO MSJ at 8 (Dkt. 51-1) (citing AR 31741, 32139).  In the meanwhile, responding to the USFS's request for input on the Project's

**MEMORANDUM DECISION AND ORDER - 25**

impact to species and habitats listed under the ESA, the U.S. Fish and Wildlife Service determined that (i) the Project was consistent with the new BiOp; (ii) the Project "may affect, but is not likely to adversely affect grizzly bear"; and (iii) "a net decrease in permanent total and open routes within the Priest BORZ" "reduce[d] impacts of the proposed action to grizzly bear to insignificant or discountable levels." AR 32143.

The USFS then attempted to correct the baseline mileage figures in the IPNF Forest Plan to align with the new BiOp, stating in a two-page letter to the "Project Record" on April 9, 2021:

> This letter documents an administrative change to table 26 of Appendix B of the revised 2015 IPNF Land Management Plan (p. 155). The purpose of this change is to correct errors contained in table 26 for the environmental baseline of miles of total and open routes in the Priest Lake, Pack River and Mission Moyie BORZ areas and to conform table 26 to table 10 contained in the Biological Opinion issued by the U.S. Fish and Wildlife Service on October 27, 2020, as a result of reinitiated consultation on the Land Management Plan. This change corrects the table 26 baseline condition of road miles where pre-existing (i.e., in 2010) roads were discovered since the plan was issued and corrects baseline miles of total and open roads where BORZ areas have expanded due to expansion of recurring grizzly bear use over the last ten years.

AR 32189 (citing 36 C.F.R. § 219.13(c)). The letter confirmed that the administrative change resulted in increased total (340.0 miles) and open (337.4 miles) baseline conditions in the Priest BORZ. *Id*. The USFS now relies on this administrative change to argue that the Project complies with the IPNF Forest Plan because the post-Project mileage is less than the corrected Access Amendment baseline conditions reflected therein. USFS's Mem. ISO MSJ at 7-9 (Dkt. 51-1) ("Road mileage in the Priest BORZ is consistent with the Forest Plan).

Alliance objects to the USFS's attempt to use an administrative change in this way. It insists that "[c]hanging – and weakening – the most important substantive Forest Plan provision for ESA-listed grizzly bears in the Priest BORZ – the road limits – is a modification of a plan component, which requires a *Forest Plan amendment*." All.'s Reply ISO MSJ at 2-4 (Dkt. 53) (citing 36 C.F.R. § 219.13(a)) (emphasis added). Until such an amendment occurs, reasons

**MEMORANDUM DECISION AND ORDER - 26**

Alliance, the Access Amendment baseline conditions remain in effect. *Id*. (citing *Native Ecosystems Council*, 418 F.3d at 961). The Court agrees.

NFMA requires that projects be consistent with the governing forest plan. *Supra* (citing 16 U.S.C. § 1604(i)). Here, the 2015 IPNF Forest Plan is the applicable forest plan, which included the 2011 Access Amendment's charge that new projects not result in road mileage increases above its identified baseline conditions. *Supra* (citing 11872-73). "If the [USFS] thinks any provision ... of the [IPNF Forest] Plan is no longer relevant, the agency should propose *amendments* to the ... [IPNF Forest] Plan altering its standards, in a process complying with NEPA and NFMA ...." *Native Ecosystems*, 418 F.3d at 961 (emphasis added).

To that end, "a plan amendment is required to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)." 36 C.F.R. § 219.13(a);[10] A plan amendment must be "consistent with [USFS] NEPA procedures." 36 C.F.R. § 219.13(b)(3). Significantly, however, any change to a forest plan that is not a plan amendment or plan revision is considered to be an *administrative change*. 36 C.F.R. § 219.13(c). "Administrative changes include corrections of clerical errors to any part of the plan, conformance of the plan to new statutory or regulatory requirements, or changes to other content in the plan (§ 219.7(f))." *Id*.[11] Therefore, a *plan amendment* is required if a change – other than a change that corrects a clerical

---

[10] "Plan components" guide future project decisionmaking and include the forest plan's desired conditions, objectives, standards, guidelines, suitability of areas, or goals. 36 C.F.R. § 219.7(e).

[11] "Other content in the plan" includes the identification of watersheds "that are a priority for maintenance or restoration"; the "plan area's distinctive roles and contributions within the broader landscape"; the "monitoring program," where applicable; "information reflecting proposed and possible actions that may occur on the plan area during the life of the plan"; and "management approaches or strategies and partnership opportunities or coordination activities." 36 C.F.R. § 219.7(f).

error, conforms the forest plan to new statutory or regulatory requirements, or changes the defined "other content in the plan" – needs to be applied to any plan component of a forest plan.

The USFS contends that "correcting the baseline mileage figures in Table 26 of the Forest Plan did not 'add, modify, or remove' any components of the Plan, nor change the substance of the road mileage standard of 'how or where' it applies to BORZ areas."  USFS's Reply ISO MSJ at 4 (Dkt. 57).  It then cites to its own April 9, 2021 letter as proof that the changes in baseline mileage figures amounted to simple corrections in the 2015 IPNF Forest Plan, and that "this type of correction does not require a forest plan amendment under 36 C.F.R. § 219.13(a)."  *Id.* at 4-5 (citing and quoting AR 32189-90 (letter stating that "[t]he purpose of this change is to correct errors contained in table 26 for the environmental baseline of miles of total and open routes in the Priest Lake, Pack River and Mission Moyie BORZ areas[.]")).

Self-serving statements within a letter announcing the fact of the alleged administrative change are to be expected.  But they do not represent objective support for the USFS's position on this point.  Nor do they operate to foreclose the argument that changes to baseline mileage figures in various BORZ areas within the IPNF represent substantive modifications to certain plan components of the 2015 IPNF Forest Plan, which require a plan amendment to accomplish. Simply put, saying that the changes in baseline mileage figures were corrections, and thus administrative changes, does not make it so.

The Court acknowledges the initial appeal of the USFS's overall argument, insofar as the USFS (i) is not rejecting the import of the 2015 IPNF Forest Plan's use of baseline mileage figures when analyzing projects impacting identified BORZ areas, but rather, (ii) with the benefit of additional data following reinitiated ESA consultation, is attempting to ensure the accuracy of those baseline mileage figures by making corresponding corrections to the 2015 IPNF Forest Plan.  USFS's Mem. ISO MSJ at 9 n.6 (Dkt. 51-1) ("The corrections do not reflect changed

conditions on the ground, but existing conditions in 2011 that were miscalculated in error at the time.").  The record supplies no reason to doubt this motivation.

Even so, in substantially changing keystone comparison points outlined six years earlier in the 2011 Access Amendment, and later expressly incorporated in the 2015 IPNF Forest Plan, the USFS is not engaging in "corrections of clerical errors" addressable by an administrative change.  36 C.F.R. § 219.13(c).  Clerical errors are understood to be relatively minor oversights that are not reasonably questioned.  *See, e.g.*, *Native Ecosystems Council v. Krueger*, 348 F. Supp. 3d 1065, 1072 (D. Mont. 2018) (administrative change proper for a "typo" in a footnote to a table); NATIONAL FOREST LAND MANAGEMENT PLANNING, 77 Fed. Reg. 211162, 21239 (Apr. 9, 2012) ("A clerical error is *an error of the presentation of material in the plan such as phrasing, grammar, typographic errors, or minor errors in data or mapping* that were appropriately evaluated in the development of the plan, plan revision, or plan amendment.  An administrative change could not otherwise be used to change plan components or the location in the plan area where plan components apply, except to conform the plan to new statutory or regulatory requirements.") (emphasis added).  Disputed baseline mileage figures for BORZ areas, even if prompted by updated calculations, do not reflect underlying clerical errors in need of a housekeeping fix that an administrative change is designed to quickly remedy.

Instead, the baseline mileage figures pertain to plan components of the 2015 IPNF Forest Plan because they help guide future project and activity decisionmaking – like the Project itself.  36 C.F.R. § 219.7(e).  Indeed, the 2015 IPNF Forest Plan suggests as much when it adopted the Access Amendment.  *See* AR  11722 (as to Access Amendment, stating: "This retained direction (desired conditions, standards, and guidelines) can be found in appendix B of this Forest Plan" and "[p]rojects and activities must be consistent with the direction within [this] decision[ ].");  AR 11855 (same); AR 1173 ("The Access Amendment also set standards for linear miles of

open and total road for areas outside the recovery zones that are experiencing recurring use by

grizzly bears (i.e., Bears Outside of Recovery Zones or BORZ ….").  Changing baseline mileage

figures materially changes the 2015 IPNF Forest Plan and therefore requires a formal plan

amendment pursuant to 36 C.F.R. § 219.13(a).  Furthermore, requiring a plan amendment in this

instance acknowledges the Access Amendment's recognition that roads and road activities

threaten grizzly bear habitat and populations, and how the baseline mileage figures contained in

the 2015 IPNF Forest Plan attempt to prospectively address those concerns.  *Supra*.  An

administrative change pursuant to 35 C.F.R. § 219.13(c) is insufficient.

Because a plan amendment is necessary to change the baseline mileage figures in the

2015 IPNF Forest Plan, the USFS did not properly alter those figures using an administrative

change.  *Supra*.  Without this change to the baseline mileage figures, the Project exceeds the

Access Amendment's baseline conditions.  *Id*.  For these reasons, the USFS has violated NFMA,

NEPA, and the APA, rendering its use of a categorical exclusion under HFRA inapplicable.

## C.    Remand Without Vacatur is the Proper Remedy

Alliance requests that the Court either vacate the Initial Decision Memo, or enjoin the

Project's implementation pending compliance with the law.  All.'s Mem. ISO MSJ at 20 (Dkt.

45-1).  The USFS urges that the proper remedy is remand without vacatur.  USFS's Mem. ISO

MSJ at 18-20 (Dkt. 51-1).

"Vacatur is the presumptive remedy when a court finds an agency's decision is unlawful

under the [APA]."  *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 880 (E.D.

Cal. 2018 (citing 5 U.S.C. § 706(2)(A)).  Despite this, vacatur is not appropriate in every case.

"When equity demands …, the [decision] can be left in place while the agency reconsiders or

replaces the action, or to give the agency time to follow the necessary procedures."  *All. for the

Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).  Whether agency action

**MEMORANDUM DECISION AND ORDER - 30**

should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012).

As to the first factor, without minimizing the USFS's violations, two things stand out. First, the Project potentially reduces total and open roads in the Priest BORZ by 1.2 miles over existing conditions. *Supra*. Second, the USFS did not altogether ignore the 2015 IPNF Forest Plan's baseline mileage figures, it just credited its later-in-time administrative change increasing them. *Id*. These circumstances mitigate the seriousness of the USFS's errors. As to the second factor, the Court is cognizant of the Project's objectives, particularly to reduce the potential for catastrophic wildfire in the area. This is to say that the disruptive consequences of vacating the Project could be significant.

The combination of these factors warrant remand over vacatur. The matter is therefore remanded to the USFS to address the deficiencies identified in this opinion and decide whether to modify the Project to comply with 2015 IPNF Forest Plan, reject the Project, or amend the 2015 IPNF Forest Plan so that the Project complies with the Access Amendment.

## V.  ORDER

Based upon the foregoing, IT IS HEREBY ORDERED that:

1.    Alliance's Motion for Summary Judgment (Dkt. 45) is GRANTED, in part, and DENIED, in part, as follows:

   a.    Alliance's Motion for Summary Judgment (Dkt. 45) is GRANTED as to Alliance's First Claim for Relief.

   b.    Alliance's Motion for Summary Judgment (Dkt. 45) is DENIED, without prejudice, as to Alliance's Second Claim for Relief.

**MEMORANDUM DECISION AND ORDER - 31**

2.      Defendants' Cross-Motion for Summary Judgment (Dkt. 51) is GRANTED, in part, and DENIED, in part, as follows:

        a.      Defendants' Cross-Motion for Summary Judgment (Dkt. 51) is DENIED as to Alliance's First Claim for Relief.

        b.      Defendants' Cross-Motion for Summary Judgment (Dkt. 51) is GRANTED as to Alliance's Second Claim for Relief.

3.      The matter is remanded to the USFS to address the deficiencies identified in this opinion.  Defendants are enjoined from implementing the Project pending compliance with the law.  Defendants shall provide a 45-day Notice preceding any beginning or resumption of Project-related implementation activities.

        IT IS FURTHER HEREBY ORDERED that Alliance's Motion to Complete and/or Supplement the Administrative Record and/or Take Judicial Notice (Dkt. 47) is DENIED.[12]



DATED:  March 31, 2025

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

---

[12] Alliance seeks to supplement the administrative record with the 2022 Selkirk Grizzly Bear Monitoring Report.  *See generally* Mem. ISO Mot. to Supp. (Dkt. 47-1).  The USFS did not oppose Alliance's request and lodged a Supplement to the administrative record with this, and other, material.  *See generally* Not. (Dkt. 48); USFS's Resp. to Mot. to Supp. (Dkt. 49).  The USFS argues that Alliance's request is therefore moot in light of the supplementation.  *Id*.  The Court agrees with the USFS, particularly when Alliance filed its Motion the same day that it reached out to the USFS about the proposed supplementation, without waiting to hear back.  As a courtesy, some level of reasonable effort to resolve disputes before filing a motion with the Court is expected.

**MEMORANDUM DECISION AND ORDER - 32**